704 So.2d 107 (1997)
Robert R. GORDON, Appellant,
v.
STATE of Florida, Appellee.
No. 86955.
Supreme Court of Florida.
November 26, 1997.
Rehearing Denied January 16, 1998.
*108 Michael Hursey of Michael Hursey, P.A., Fort Lauderdale, for Appellant.
Robert A. Butterworth, Attorney General and Carol M. Dittmar, Assistant Attorney General, Tampa, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon appellant Robert R. Gordon.[1] We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm Gordon's first-degree murder conviction and sentence of death.

FACTS
Dr. Louis A. Davidson and his wife Denise were in the midst of a bitter custody battle and divorce. Both were engaged to other people at the time of Dr. Davidson's murder; Mrs. Davidson was engaged to another codefendant, Leonardo Cisneros.
Mrs. Davidson and Cisneros arranged for McDonald and Gordon to kill her husband. To that end, they made several trips from Miami to Tampa in late December 1993 and early January 1994, where several witnesses, including Gordon's friend Clyde Bethel,[2] testified that they met Cisneros, met with a lady about some money they were owed, drove past a hospital to see an emergency room, and went to the Thunder Bay Apartments to see about renting an apartment.
On January 24, 1994, McDonald and Gordon hired Susan Shore to drive them from Miami to Tampa so that they could visit a friend and "pick up a piece of paper."[3] Upon arriving in Tampa, they met with a lady Shore later identified as Mrs. Davidson and someone named "Carlos," whom Shore later identified as Cisneros. After McDonald, Gordon, and Shore checked into a Days Inn, Cisneros came by and left with McDonald and Gordon. McDonald and Gordon returned later than night.
*109 Early the next morning, January 25, 1994, they drove to Thunderbay Apartments in St. Petersburg to "where their friend lived," presumably Dr. Davidson. While they waited for Dr. Davidson to return from his night shift at Bayfront Hospital, McDonald got out of the car and said he was going jogging. Shore and Gordon played catch with a cricket ball on the apartment grounds. When Dr. Davidson pulled into the parking lot a short time later, Gordon told Shore, "Here is my friend. You can go sit in the car now." While Gordon went over and talked to Dr. Davidson, Shore sat in the car and read a newspaper. Shore testified that Davidson and Gordon then walked toward Davidson's apartment, with Gordon following Davidson. She last saw Davidson and Gordon going underneath the stairwell immediately adjacent to Davidson's apartment door. Gordon came back to the car about twenty to twenty-five minutes later; McDonald returned five to ten minutes after Gordon. McDonald told Gordon that "he had the piece of paper." McDonald patted his stomach and Shore heard something crinkle.
Shore testified that as they drove back to the hotel, McDonald called "Carlos" on his cell phone and said "he had it." "Carlos" came to the hotel, talked with McDonald and Gordon, and then left. "Carlos" later returned with the lady they had met with upon their arrival in Tampa. Shore identified a picture of Mrs. Davidson as the lady she had seen. A short time later, Shore, McDonald, and Gordon drove back to Miami.
Dr. Davidson's body was discovered later that day by his fiancee, Patricia Deninno. She found him blindfolded, bound, gagged, and hogtied, lying face down in a bathtub full of bloody water. He was tied with a vacuum cleaner cord and a cashmere belt. Pieces of towel were wrapped around his head and used as a gag. The toilet bowl had been broken off its foundation and the resulting water leak had partially flooded the apartment. Blood was spattered on the bathroom walls and the apartment had been ransacked. There was no indication of forced entry. Shoe prints were found on a tiled floor in the apartment. Dr. Davidson's watch, a camera, and a money clip with several hundred dollars were missing. Although the apartment had been ransacked, $19,300 in cash and some credit cards remained.
The police placed Mrs. Davidson under surveillance shortly after Dr. Davidson's murder. Using the name "Pauline White," Mrs. Davidson subsequently made numerous trips to Western Union. Evidence was later presented that twenty-one money transfers were made, both before[4] and after the murder, with nineteen going to Gordon.[5] McDonald's girlfriend, Carol Cason, picked up two of the transfers at his request.
The police also obtained phone records which showed numerous contacts among the codefendants both prior to and after the murder. The records showed that on the day of the murder, Mrs. Davidson called McDonald's beeper fifty times during a period of two and a half hours. Mrs. Davidson also bought a cell phone and gave it to McDonald and Gordon, which was then used repeatedly to make hang-up calls to Dr. Davidson's home and place of work. Several Thunder Bay employees testified that McDonald and Gordon were in the management office on January 18, 1994, and received a copy of the floor plan to Dr. Davidson's apartment. Gordon's friend, Clyde Bethel, confirmed that McDonald and Gordon visited Dr. Davidson's apartment complex that day.
Physical evidence was also recovered from the Days Inn where McDonald, Gordon, and Shore spent the nights of January 24-25, 1994. A sweatshirt and a pair of tennis shoes were found in their room. The tennis shoes had the same sole pattern as the shoeprints found in Dr. Davidson's apartment. Flecks of human blood were found on the shoes, but the sample was too small to match. The sweatshirt contained fibers from Dr. *110 Davidson's carpet and Deninno's cashmere belt, as well as hairs that matched McDonald's. Dr. Davidson's blood sample matched the DNA found in stains on the sweatshirt. Receipts confirmed that on the day before the murder, Denise Davidson had purchased a pair of sneakers, a gray sweatshirt, and a purple sweatshirt.
The associate medical examiner, Dr. Marie Hansen, testified that Dr. Davidson had bruises on his face and shoulders, three broken ribs, and multiple lacerations on the back of his scalp, probably caused by a blunt object. The cause of death was drowning. The medical examiner could not determine whether Dr. Davidson was conscious when he died, saying it was possible that he was knocked unconscious by the first blow to his head. Dr. Hansen also testified that from the multiple bindings on his wrists, Dr. Davidson had probably freed one of his wrists during the altercation, only to be retied with the belt.
After a jury trial, both defendants were found guilty of first-degree murder. During the penalty phase, Gordon's sister, Norma Rose, testified that he was a concerned and loving brother and a kind and loving parent to his children. Gordon's mother, Estella Stuckey, testified that they had a good relationship and that Gordon was a kind and loving son. Finally, Gordon's pastor testified that he attended his church regularly from late 1991 to late 1992 and led some home Bible studies. The State did not present any further evidence during the penalty phase.
The jury recommended death sentences for both defendants by a vote of nine to three. Before Gordon's sentencing, co-defendant Denise Davidson was convicted in a separate trial of first-degree murder, received a life recommendation from the jury, and was sentenced to life imprisonment.[6] The trial judge held two Spencer[7] hearings prior to sentencing Gordon to death on November 16, 1995.[8]

APPEAL
Gordon raises five claims of error on appeal.[9] We address each claim in turn.

Motion to Strike Venire
As his first guilt phase issue, Gordon contends that since all the members of the venire from which his jury was chosen were white, he had no chance to get a "jury of his peers" that was a fair cross-section of the community in Pinellas County.[10] His claim is without merit.
The United States Supreme Court has set clear guidelines to ensure that juries are drawn from a fair cross section of society. *111 In Taylor v. Louisiana, 419 U.S. 522, 538, 95 S.Ct. 692, 702, 42 L.Ed.2d 690 (1975), the Court held that "petit juries must be drawn from a source fairly representative of the community [although] we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population." To that end, while defendants are not entitled to a particular jury composition, "jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." Id., at 538, 95 S.Ct. at 702 (emphasis added). Accordingly, the Court invalidated those sections of Louisiana's constitution and criminal procedure code which precluded women from serving on juries unless they expressly so requested in writing.
Several years later under slightly different facts, the Court invalidated a Missouri statute which provided an automatic exemption for any woman that asked not to serve on jury duty. Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). To give effect to Taylor's fair cross-section requirement, the Court established a three-prong test for determining a prima facie violation thereof. Id., at 364, 99 S.Ct. at 668. The proponent must demonstrate:
(1) that the group alleged to be excluded is a `distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

Id. (emphasis added). Since the Court in Taylor had already found that women "are sufficiently numerous and distinct from men," 419 U.S. at 531, 95 S.Ct. at 698, Duren only needed to satisfy the last two prongs of the test. He did this by presenting statistical data which showed that women comprised over fifty percent of the relevant community but only approximately fifteen percent of the jury venires, Duren, 439 U.S. at 364-66, 99 S.Ct. at 668-69, and demonstrating that this large discrepancy "occurred not just occasionally, but in every weekly venire for a period of nearly a year." Id., at 366, 99 S.Ct. at 669. The Court concluded that this undisputed trend "manifestly indicates that the cause of the underrepresentation was systematicthat is, inherent in the particular jury-selection process utilized." Id. Thus the Court instituted the procedures for establishing a prima facie violation of the Sixth Amendment's fair cross-section requirement.[11]
In this case, there is no evidence in the record that Gordon followed these procedures in challenging the venire. Indeed, beyond some general objections about the venire's composition, the issue was only briefly raised and then without supporting data. Since counsel was presumably aware of the fair cross-section requirement and the Duren test for establishing a prima facie violation, it made no sense to claim, off the cuff, that there was an unrepresentative venire if, first, counsel did not have any supporting data and, second, counsel was aware of the random method from which venires were generated in his county.[12] Counsel made no attempt to comply with the Duren procedures for substantiating a fair cross-section violation, not to mention Florida Rule of Criminal Procedure 3.290, which requires that "[a] challenge to the [jury] panel shall be in writing and shall specify the facts constituting *112 the ground of the challenge." (Emphasis added.)
Instead, after the venire entered the courtroom, McDonald's counsel simply commented to the court that "despite the fact that both of our clients are black, there are no blacks on the jury panel." Counsel objected that the venire did not represent "a fair cross section of Pinellas County." After Gordon's counsel joined in the objection, the trial judge noted that:

Counsel on both sides are well aware that the jurors are selected at random in Pinellas County by computer and they are likewise selected at random as a panel downstairs. I'm sure there are some black ones downstairs, but if I started plucking them out, that would be just as wrong. In other words, I have no reason to doubt that these folks were picked totally at random by the computer selection and at this point in time, I'm sure we may be adding to the group, so your motion is noted. It's overruled because there's nothing I can do about it. But as I said, if there's any change, why I will make sure that the record reflects that there are some blacks to be added to the panel.[13]
(Emphasis added.) Neither McDonald's nor Gordon's counsel challenged the factual basis of the trial judge's ruling that the venire was randomly selected by computer, nor did either of them follow any of the procedures established in Duren or required by Florida Rule of Criminal Procedure 3.290 for substantiating a prima facie violation of the fair cross-section requirement.
Similarly, on appeal, Gordon does not challenge the process from which the venire is generated in Pinellas County. Indeed, Gordon acknowledges that the venire was selected randomly when he suggests in his brief that "[i]f there were no blacks there that day, the court could have reconvened the next day and used the same random procedure it used to get these first fifty." (Emphasis added.)
Accordingly, we agree with the State that our decision in Johnson v. State, 660 So.2d 648 (Fla.1995), is dispositive of this issue.[14] In Johnson, the defendant claimed that he was not tried by a representative jury since, in his four separate cases, only two out of one hundred sixty venire members were black. We dismissed Johnson's claim, finding no error since it was unrebutted that the venire was randomly generated by computer. Id. at 661. Since that is precisely the situation here, we find no error in the trial court's denial of Gordon's motion. Therefore, we decline to employ a Duren analysis since Gordon made no factual showing to the trial court from which such an analysis could be made.

Motion for Judgment of Acquittal
Gordon next claims that since the State could only place him near the scene around the alleged time the murder occurred and scientific evidence shows that he was never in the apartment where the murder took place, the trial court erred in not granting Gordon's motion for judgment of acquittal. We disagree.
We have repeatedly reaffirmed the general rule established in Lynch v. State, 293 So.2d 44 (Fla.1974), that:
[C]ourts should not grant a motion for judgment of acquittal unless the evidence is such that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law.
Id. at 45; see Gudinas v. State, 693 So.2d 953 (Fla.1997), cert. denied, ___ U.S. ___, 118 S.Ct. 345, 139 L.Ed.2d 267, (1997); Barwick v. State, 660 So.2d 685 (Fla.1995); DeAngelo v. State, 616 So.2d 440 (Fla.1993); Taylor v. State, 583 So.2d 323 (Fla.1991). In circumstantial evidence cases, "a judgment of acquittal is appropriate if the State fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt." Barwick, 660 So.2d at 694.
Therefore, at the outset, "the trial judge must first determine there is competent *113 evidence from which the jury could infer guilt to the exclusion of all other inferences." Barwick, 660 So.2d at 694. After the judge determines, as a matter of law, whether such competent evidence exists, the "question of whether the evidence is inconsistent with any other reasonable inference is a question of fact for the jury." Long v. State, 689 So.2d 1055,1058 (Fla.1997).
In this case, Gordon does not deny that voluminous circumstantial and direct evidence links him to the extensive planning and surveillance activities in the weeks and months leading up to Dr. Davidson's murder. Gordon also does not deny that he was present at Thunder Bay apartments the day Dr. Davidson was murdered, that he met Dr. Davidson at his car, and that he walked with him toward his apartment. Although he claims that no evidence places him in the apartment, he does not account for his precise whereabouts during the time from when he left Susan Shore's sight while accompanying Dr. Davidson to his apartment door and his reappearance at the car twenty to twenty-five minutes later, a time when other evidence suggests the homicide occurred.
Moreover, Gordon contradicts himself when he states in his brief that "even [my] alleged statement [to Susan Shore] that `the doctor didn't want to give up the piece of paper,' is entirely consistent with a burglary or robbery, as opposed to a murder." If that is so, then Gordon apparently concedes, as the circumstantial evidence indicates, that he was inside the apartment to, at least, perpetrate a robbery. Susan Shore placed Gordon near Davidson's apartment door by testifying that she saw Gordon and Davidson "go underneath the stairwell" proximate to Davidson's apartment door. In other words, Gordon has no alibi.[15] While he ultimately argues that the State produced insufficient evidence to convict him of first-degree murder, Gordon advances no argument that remotely challenges the legal basis of the trial court's denial of his motion for judgment of acquittal. Accordingly, we approve of the trial court's denial of Gordon's motion for judgment of acquittal. Gudinas; Barwick; DeAngelo; Taylor.

Separate Penalty-Phase Jury
As his first penalty-phase issue, Gordon argues that the trial court erred in not granting his motion for not only a separate penalty-phase jury but also a separate jury for each defendant. This claim is without merit.
Our review of the record confirms the State's assertion that during the trial, Gordon never made a motion for a separate jury for the penalty phase or for separate penalty-phase juries for each co-defendant.[16] There is no mention of either of these issues during the guilt phase or in the transcript of the penalty-phase proceedings. Before the jury was sworn for the penalty phase, the discussion exclusively centered on jury instructions. The State correctly notes that McDonald's counsel first raised the issue in open court at the initial Spencer hearing on August 4, 1995, nearly two months after the penalty phase was conducted on June 16, 1995. At that time, McDonald's counsel referred to a joint defense motion filed on June 23, 1995, titled "Motion for New Trial-Penalty Phase." While the motion does request "a new penalty phase of the trial," it does not *114 address the discrete issue of separate penalty-phase juries for each defendant. Beyond that, the motion was filed a week after the penalty phase concluded. Therefore, since the issues were not raised contemporaneously with the penalty phase proceedings, they are procedurally barred.

HAC and CCP
Gordon challenges the evidentiary basis for the trial court's findings that the murder was cold, calculated, and premeditated and heinous, atrocious, or cruel. We find his claim to be without merit.
Initially we note the abundance of circumstantial evidence that this was a contract murder, a killing that was painstakingly planned for months, and which included harassment and extensive surveillance of the victim at work and home. See Archer v. State, 673 So.2d 17, 19 (Fla.1996) (CCP is primarily reserved for contract, execution-style, and witness-elimination killings), cert. denied, ___ U.S. ___, 117 S.Ct. 197, 136 L.Ed.2d 134 (1996); Dailey v. State, 594 So.2d 254, 259 (Fla.1991) (same); Hansbrough v. State, 509 So.2d 1081 (Fla.1987). Therefore, based on review of our prior case law and the facts of this case, we affirm the trial court's finding of the CCP aggravator.
In Jackson v. State, 648 So.2d 85 (Fla. 1994), we extensively analyzed our prior case law. From that survey, we limited CCP to the following elements:
[T]he jury must first determine that the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); and that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated); and that the defendant exhibited heightened premeditation (premeditated); and that the defendant had no pretense of moral or legal justification.
Id. at 89 (citations omitted). Thus, unless all the elements are established, we will not uphold the finding of a CCP aggravator. Further, while CCP can be established by circumstantial evidence, it "must be inconsistent with any reasonable hypothesis which might negate the aggravating factor." Geralds v. State, 601 So.2d 1157,1163 (Fla.1992).
In Geralds, we invalidated the CCP aggravator after concluding that the defendant had proffered a "cohesive reasonable hypothesis" that he lacked the requisite heightened premeditation. Id. at 1164. We reached that conclusion after observing that:
Geralds argues that this evidence establishes, at best, an unplanned killing in the course of a planned burglary, and that a planned burglary does not necessarily include a plan to kill. Geralds offers a number of reasonable hypotheses which are inconsistent with a finding of heightened premeditation. Geralds argues, first, that he allegedly gained information about the family's schedule to avoid contact with anyone during the burglary; second, the fact that the victim was bound first rather than immediately killed shows that the homicide was not planned; third, there was evidence of a struggle prior to the killing; and fourth, the knife was a weapon of opportunity from the kitchen rather than one brought to the scene.
Thus, although one hypothesis could support premeditated murder, another cohesive reasonable hypothesis is that Geralds tied the victim's wrists in order to interrogate her regarding the location of money which was hidden in the house. However, after she refused to reveal the location, Geralds became enraged and killed her in sudden anger. Alternatively, the victim could have struggled to escape and been killed during the struggle.
In light of the fact that the evidence regarding premeditation in this case is susceptible to these divergent interpretations, we find the State has failed to meet its burden of establishing beyond a reasonable doubt that this homicide was committed in a cold, calculated, and premeditated manner.
Id. at 1163-64.
Similarly, in Barwick v. State, 660 So.2d 685, 696 (Fla.1995), we invalidated the CCP aggravator after concluding that the evidence only supported the defendant's intention to rape, rob, and burglarize rather than murder. After observing the victim while she sunbathed at her apartment complex, Barwick *115 drove home, parked his car, got a knife from his house, and walked back to the victim's apartment complex. Barwick then walked past her three times and followed her into her apartment. Barwick stated that he only intended to steal something, but lost control and stabbed the victim when she resisted. Barwick said he continued to stab the victim as they struggled and fell to the floor. Id. at 689. In striking the CCP aggravator, we found that the evidence did not demonstrate that Barwick had a careful plan or prearranged design to murder, noting that a "plan to kill cannot be inferred solely from a plan to commit or the commission of another felony." Id. at 696 (quoting Geralds, 601 So.2d at 1163).
In contrast, we upheld the CCP aggravator in Lockhart v. State, 655 So.2d 69 (Fla. 1995). We found that:
The facts of this case alone support a finding of CCP. [Defendant] Lockhart went to Colhouer's house in the afternoon. There was no evidence of forced entry, so apparently Lockhart convinced Colhouer to let him in. The evidence shows that she was bound at one time and tortured by small pricking knife incisions just below the skin. She was then strangled and, while still alive, stabbed with several incisions. She was also anally assaulted. When police arrived, Colhouer was found naked from the waist down.
It is evident that this killing was not something that occurred on the spur of the moment. The fact that Colhouer was bound and tortured before she was killed indicates that the incident happened over a period of time. The nature and complexity of the injuries indicate that Lockhart intended to do exactly what he did at the time he entered Colhouer's house. Thus, the trial court did not err in finding CCP.
Id. at 73. We reached the same conclusion in Gamble v. State, 659 So.2d 242, 244 (Fla. 1995), where the defendant told his girlfriend six days prior to the murder that he was going to "take out" the eventual victim, his landlord. Gamble actually rehearsed the murder with his girlfriend by sneaking up behind her and practicing a choke hold on her with a cord. Id. The day of the murder Gamble picked up his paycheck and returned home where he and his roommate, Michael Love, gathered money to use as a guise for rent payment. Id. After speaking with the landlord in his garage, they asked him for a receipt. While the landlord went to his apartment to get a receipt, Love searched for a weapon in the garage and found a claw hammer.
When the landlord returned to the garage, Gamble struck him on the head with the claw hammer. Id. at 245. The extreme force of the blow knocked the landlord to the ground. Gamble then got on top of the landlord and held him down while he told Love to shut the garage doors. Id. After closing the garage doors, Love repeatedly struck the landlord on the head with the hammer. After he stopped pummeling the landlord with the hammer, Love wrapped a cord around his neck and began choking him. At this point, Gamble told Love that there was no reason to choke the victim and suggested that they leave him. Id. Gamble and Love then stole the landlord's car, picked up their girlfriends, ate at Kentucky Fried Chicken, forged and cashed an $8544 check on the landlord's account, and then drove to Mississippi. Id. We found that "[t]hese facts, which speak for themselves, completely support the trial court's finding of cold, calculated, and premeditated." 659 So.2d at 245.
Against that backdrop, we now analyze Gordon's claim that there is a reasonable hypothesis that he was planning a burglary or robbery rather than a murder. At the outset, assuming that Gordon and McDonald were truly planning a burglary, a reasonable hypothesis would be that they would want to break into Davidson's apartment when he was not at home to take "the piece of paper" they were allegedly seeking. If that was their goal, they would probably want to focus their energies on finding that paper and taking any valuables, rather than confronting an occupant who could possibly have a gun, phone 911, etc.[17] As they certainly knew *116 Davidson's schedule almost down to the minute as a result of their extensive surveillance activities, they could have easily avoided encountering him if that is what they truly desired. Instead, they waited for him to return home before executing their plan, a critical fact we must consider in determining this issue.
Alternatively, if the defendants were planning a robbery, they could have certainly achieved their aims after binding, gagging, and hogtieing Dr. Davidson. Obviously, he was in no position to resist any robbery attempts at that point. Furthermore, since they found the "piece of paper" they were allegedly seeking, and Dr. Davidson was powerless to resist them, they had no reason to kill him unless that is what they intended to do all along. As noted above, the fact that Gordon and McDonald did not take the substantial amount of cash and credit cards in the apartment appears to belie Gordon's proffered theory of burglary or robbery as their motive.
Gordon also claims that since McDonald had the piece of paper, knew about the Rolex watch,[18] and returned to their car after he did, it shows that he, Gordon, "was not knowledgeable about what happened with the victim." However, at most, that exchange indicates Gordon wished they had taken more valuables from Davidson's apartment, and McDonald's delayed return to the car was meant to maintain the ruse that McDonald was only then returning from his jog.
Accordingly, we do not believe Gordon has proffered any reasonable hypothesis of what may have happened other than a plan to rob and murder Dr. Davidson. Beyond veiled allusions that McDonald may have committed the murder since McDonald returned to the car later than he did and his unconvincing references to a "mystery man" in the stairwell's shadows, Gordon has no reasonable explanation of what happened that differs from what the trial court found. As such, we conclude that the factors which led us to invalidate the CCP findings in Geralds and Barwick are not present in this case. On the other hand, we find Lockhart and Gamble comparable.
Regarding the HAC aggravator, the trial court found as follows:
These two defendants broke into Dr. Davidson's home, used the cord from his vacuum cleaner to bind his hands and feet, and hogtied him. He was blindfolded and gagged. He was struck on the head eight to ten times. His ribs were broken. He was ultimately placed face down in his own bathtub and drowned. While the medical examiner opined that the doctor could have been rendered unconscious from the first blow to the head, the facts belie that this is what happened. If the victim had been rendered unconscious from the first blow, why inflict the others? Why blindfold him if he couldn't see? Why tie him up if he were lifeless?
All of the physical evidence at the scene shows signs of a struggle, and a conscious victim. Blood was splattered on the wall of the bathroom. The toilet was broken at its base, obviously from a struggle. The doctor managed to get one hand free from the vacuum cord and it was retied with a belt from the doctor's coat. Neck injuries were observed indicating a ligature mark consistent with a tightening of the bindings around the victim's neck.
Dr. Davidson was tortured, plain and simple. Finally these defendants placed his battered, bruised, and hogtied body face down in his own tub. As the water filled around him, Dr. Davidson surely knew death was a certainty. This was a conscienceless, pitiless, and unnecessarily torturous murder.
This aggravating factor was proven beyond a reasonable doubt against each defendant.
Our review of the record indicates that this is an accurate statement of the evidence adduced at trial. We believe the evidence "is broad enough that a trier of fact could reasonably *117 infer that [Dr. Davidson] was conscious," Gudinas, 693 So.2d at 966, while the violent beatings and injuries were inflicted upon him before he was placed in the bathtub and drowned. Accordingly, we conclude that the trial judge did not abuse her discretion in finding this aggravator. See Taylor v. State, 630 So.2d 1038, 1043 (Fla.1993) (affirming HAC finding where victim was stabbed twenty times and suffered twenty-one other lacerations and wounds even though medical examiner could not confirm consciousness during all or any part of attack).

Proportionality
Next, Gordon contends that his death sentence is disproportionate since co-defendant Denise Davidson only received a life sentence. We disagree.
The trial judge found Davidson's life sentence to be mitigating, but accorded it only a modest amount of weight "in light of the vast differences in the aggravating and mitigating circumstances presented in her case" as opposed to Gordon's. The trial court was informed of the details of Denise Davidson's sentencing and the factors applied by Assistant State Attorney Shaw's sworn testimony and the State's supplemental sentencing memorandum, dated October 9, 1995. After convicting her of first-degree murder, the jury recommended that Davidson be sentenced to life imprisonment without the possibility of parole for twenty-five years. The trial judge followed the jury's advisory sentence and imposed the recommended life sentence. The trial judge found the two statutory aggravators that the capital felony was committed while Davidson was an accomplice in or engaged in the commission of or attempt to commit a burglary or robbery or both and CCP; the trial judge found the three statutory mitigators of Davidson's age; lack of significant prior criminal history; and action under extreme duress or under the substantial domination of another person; and, finally, the trial judge found significant nonstatutory mitigation, including Davidson's family background; her community activities; the quality of being a caring parent; and her employment background. Our prior case law supports the trial judge's finding and sentence of death here. Again, we find our reasoning in Gamble helpful in addressing this issue.
On appeal, Gamble claimed that his sentence of death was disproportionate because, among other reasons, codefendant Love received a life sentence. Gamble, 659 So.2d at 245. In rejecting his argument, we reasoned as follows:
One of [Gamble's] non-statutory mitigating factors given "some" weight was Love's sentence of life. Gamble asserts that his jury would have also recommended a life sentence if it had been informed of Love's sentence. Gamble proffers that this factor singlehandedly requires a sentence reduction. We disagree. Love's sentence was based on a guilty plea entered after Gamble's penalty phase proceedings. Clearly the Gamble trial judge was not required to postpone Gamble's sentencing and await Love's plea and sentence. We refuse to speculate as to what may have occurred had the Gamble jury been made aware of the posture of Love's case.

Id. (emphasis added). Therefore, we found no error in the trial court's refusal to postpone the penalty phase until after Love's plea and sentence.
Like Mrs. Davidson, Love was a participant in a conspiracy to murder. Unlike Mrs. Davidson, Love was an active participant in the murder itself and may have actually delivered the fatal blows to his landlord's head. Id. at 244 n. 1 (noting that the official cause of death was "blunt head injury due to multiple blows to the head, with a neck injury as a contributory factor"). Therefore, since we found no error in Gamble's penalty phase concluding without Love's life sentence coming before the jury, we reach the same conclusion in this case.
In the final analysis, the record does not support Gordon's claim that "the evidence against [him] and Davidson is about the same." See Hannon v. State, 638 So.2d 39, 44 (Fla.1994) ("[A] death sentence is not disproportionate when a less culpable codefendant receives a less severe punishment."); Coleman v. State, 610 So.2d 1283, 1287 (Fla. 1992) (same); Hayes v. State, 581 So.2d 121 *118 (Fla.1991); Downs v. State, 572 So.2d 895 (Fla.1990); see also Steinhorst v. Singletary, 638 So.2d 33, 35 (Fla.1994)("When codefendants are not equally culpable, the death sentence of the more culpable codefendant is not unequal justice when another codefendant receives a life sentence."). Since Mrs. Davidson and Gordon were not equally culpable, Gordon's death sentence is not disproportionate on the basis of her life sentence.
We conclude that substantial, competent evidence exists in the record to support the trial court's finding of four aggravators and relatively minor nonstatutory mitigation. Accordingly, we find that Gordon's death sentence is proportionate to other cases where sentences of death have been imposed. Gamble; Marshall v. State, 604 So.2d 799 (Fla.1992) (affirming death sentence where four strong aggravators, including HAC, prior violent felony convictions, and murder during commission of burglary outweighed minor mitigation).

CONCLUSION
In summary, we affirm Gordon's first-degree murder conviction and sentence of death.
It is so ordered.
KOGAN, C.J., OVERTON, SHAW, HARDING, WELLS and ANSTEAD, JJ., and GRIMES, Senior Justice, concur.
NOTES
[1] The grand jury indictment charged Gordon, Meryl McDonald, Susan Shore, Denise Davidson, and Leonardo Cisneros with first-degree murder in Dr. Louis A. Davidson's death. McDonald and Gordon were tried jointly for the murder.
[2] Bethel was one of at least five people who drove Gordon and McDonald from Miami to Tampa in the weeks and months preceding the murder. The other individuals who, along with Bethel, testified to these trips at trial were Patricia Vega, Maurice Dixon, Brenda King, and Claudia Williams.
[3] The "piece of paper" may have been letters from Mrs. Davidson to Dr. Davidson or vice versa. A fellow employee of Mrs. Davidson's, Pam Willis, spent the night of January 25, 1994, at Mrs. Davidson's home. That was the same day Dr. Davidson was murdered. While at Mrs. Davidson's house, Willis smelled smoke and saw burnt ashes in the bathroom. The next day, Mrs. Davidson told Willis "that that was old letters that she didn't want anybody to read from the doctor that she had burned."
[4] Mrs. Davidson began sending Gordon and McDonald money as early as August 1993.
[5] At oral argument, the State estimated that the amount transferred from Mrs. Davidson to Gordon and McDonald exceeded $15,000. On rebuttal, Gordon's counsel did not challenge that figure. The State further noted that Gordon and McDonald also received an undisclosed amount of money on each of the four trips they made from Miami to Tampa.
[6] Cisneros remains a fugitive, while Shore had the charges against her reduced to accessory after the fact, for which she received probation after agreeing to testify for the State.
[7] In Spencer v. State, 615 So.2d 688, 690-91 (Fla.1993), we explained the procedures a trial court must follow in sentencing phase proceedings after receiving the jury's recommendation. Spencer reaffirmed our directive in Grossman v. State, 525 So.2d 833, 841 (Fla.1988), establishing a procedural rule requiring "that all written orders imposing a death sentence be prepared prior to the oral pronouncement of sentence for filing concurrent with the pronouncement."
[8] The trial court found the following statutory aggravators: (1) the murder was committed during the commission of a burglary and robbery, section 921.141(5)(d), Florida Statutes (1993); (2) the murder was committed for pecuniary gain, section 921.141(5)(f); (3) the murder was especially heinous, atrocious, or cruel (HAC), section 921.141(5)(h); and (4) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP), section 921.141(5)(i). The trial court found no evidence to support Gordon's proffered statutory mitigator: his age at the time of the crime. In nonstatutory mitigation, the trial court accorded Gordon's "totally unremarkable" family background very little weight; accorded his religious devotion some weight; and accorded codefendant Denise Davidson's life sentence a modest amount of weight.
[9] The claims are: (1) the trial court erred in denying Gordon's motion to strike the venire; (2) the trial court erred in denying Gordon's motion for judgment of acquittal at the close of the evidence; (3) the trial court erred in denying Gordon's request for a separate penalty phase jury from that of his codefendant and a new penalty phase jury; (4) Gordon's death sentence is disproportional; and (5) the trial court erred in finding the cold, calculated, and premeditated and heinous, atrocious, or cruel aggravating circumstances.
[10] Gordon is black.
[11] The Court also noted that the establishment of a prima facie violation did not conclusively demonstrate that a constitutional violation had occurred. Id., at 367, 99 S.Ct. at 670. If the State could show that the attainment of a fair cross-section is incompatible with a significant State interest, no constitutional violation would be found. Id. at 368. To survive that heightened standard of scrutiny, the significant state interest must "be manifestly and primarily advanced by those aspects of the jury selection process, such as exemption criteria, that results in the disproportionate exclusion of a distinctive group." Id., at 367-68, 99 S.Ct. at 670.
[12] Gordon does not explain how the trial judge was supposed to conclude, under Duren, that his venire was not a fair cross-section of the relevant community, since he did not provide her with any data from which to make such an informed decision.
[13] Gordon's counsel renewed the objection after jury selection was completed.
[14] Although Gordon has made two motions to this Court to supplement the record with Pinellas County population statistics, none of this was done at trial in accord with Duren and Florida Rule of Criminal Procedure 3.290.
[15] Gordon's reference to a "mystery man" in the shadows at the stairwell as the possible murderer is unconvincing. The jury could have very reasonably inferred that the unidentified black male was McDonald, who had supposedly departed a few minutes earlier to go jogging, especially since Susan Shore testified that McDonald "went out of my sight walking towards the stairwell." (Emphasis added.) Since unrebutted scientific evidence confirmed McDonald's presence in Dr. Davidson's apartment, the jury could have made the logical inference that McDonald waited in the stairwell until Dr. Davidson and Gordon passed by, and then followed them into Davidson's apartment.
[16] McDonald had filed a motion to sever the trial on June 5, 1995, the day before the trial began. This was in response to Gordon's notice of intent to claim alibi, filed on May 26, 1995. Gordon planned to claim that he was in Miami the day of the murder and therefore had an alibi. However, after Gordon withdrew his motion to claim an alibi in open court on June 6, 1995, the opening day of trial, McDonald similarly withdrew his motion to sever. Other than McDonald's withdrawn motion to sever, we find nothing in the record which shows that motions for a separate penalty phase jury or separate penalty phase juries for each defendant were ever made during trial.
[17] Despite his assertion that the facts of the crime "are just as consistent with a burglary or a robbery (as opposed to the charged murder)," even Gordon concedes that $19,300 in cash and some credit cards were left in the apartment. Obviously, that fact undercuts Gordon's theory that burglary or robbery was the motive in entering Dr. Davidson's apartment.
[18] Once McDonald returned to the car, Gordon told him, "I'm still not happy," to which McDonald replied, "Don't worry, I still have the Rolex."