733 So.2d 980 (1999)
Terry Lee WOODS, Appellant,
v.
STATE of Florida, Appellee.
No. 90,833.
Supreme Court of Florida.
April 15, 1999.
Rehearing Denied June 15, 1999.
*982 James B. Gibson, Public Defender, and George D.E. Burden, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, Florida, for Appellant.
Robert A. Butterworth, Attorney General, David M. Schultz, Assistant Attorney General, West Palm Beach, Florida, and Katherine V. Blanco, Assistant Attorney General, Tampa, Florida, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court adjudicating Terry Lee Woods guilty of first-degree murder and attempted murder and imposing the death penalty. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For reasons that follow, we reject Woods' claims of error during his trial and affirm his convictions but we reverse his sentence of death and remand this case to the trial court to impose a sentence of life imprisonment without possibility of parole.

MATERIAL FACTS
Woods was charged and convicted of first-degree murder of Clarence Langford and attempted first-degree murder of Pamela Langford based on a shooting incident on June 12, 1996, apparently involving confusion and a misunderstanding over the sale of an automobile. At trial, Mrs. Langford provided most of the evidence as to the events leading up to the shooting. She stated that sometime in March 1996, Woods offered to purchase one of their cars, a white Chevrolet. After friendly negotiations, Mr. Langford agreed to sell the car but arranged for payment on an installment basis before allowing Woods to take possession. After Woods made substantial payment, the Langfords allowed him to take the car home but instructed him not to drive it until the title was transferred. When Woods drove the car anyway and was issued a traffic citation on May 10, the Langfords took the car back that night. Woods later went to their house, threatened Mr. Langford, and demanded the return of his money. When Mrs. Langford called the police, Woods left without further incident. The Langfords *983 returned Woods' money to him the following Monday.
Negotiations on the sale resumed several weeks later. Mrs. Langford testified that her husband refused to sell Woods the car until he could pay all of the money at once. Testimony at trial indicated that Woods called the police on a couple of occasions between May and June of 1996. On one of the occasions, he told an officer that he was paying for a car and wanted permission to drive it although he did not own the title and registration for the car. Another time, Woods called the police demanding that they order the Langfords to release the car. On June 11, Woods called the Langfords and unsuccessfully asked them to meet him that night to finalize the sale. On the following day, Woods again called requesting that the Langfords meet him since he had the money and wanted them to sign a bill of sale for the car and have it notarized.[1] Accordingly, at 9 p.m. that night, the Langfords met Woods at the community library. Woods got in the back seat of the Langfords' car and directed Mr. Langford to a dirt road where his girlfriend lived; he wanted to include his girlfriend as a witness to the transaction. When Mr. Langford stopped the car because there were too many potholes in the road, Woods said he would go on foot to get his girlfriend and come right back. Thereafter, Mrs. Langford heard an explosion "inside her head" and saw Woods running away from the car. Both victims had been shot multiple times with a small-caliber firearm. Mrs. Langford survived but Mr. Langford died.
The medical examiner testified that both victims were shot in the right side of the head, that each of the wounds was consistent with the other and that all wounds came from the same small caliber firearm. Police discovered shell casings inside the victims' car and on the ground outside the rear passenger-side door, which were consistent with a .25-caliber firearm. Police also recovered from Woods' house a bill of sale with Mr. Langford's apparently forged signature on it,[2] several receipts from the sale of the car, and the citation issued to Woods. The firearm used during the homicide was never recovered.
The defense presented evidence that Woods was at home the night of the murder and that another person had shot the victims. Two witnesses,[3] Antoine Jones and Alicia Hill, testified that a man by the name of Tim Bryant shot the victims. Although Jones claimed that he saw Bryant shoot the Langfords, he changed his story several times and ultimately admitted to the police that he lied about witnessing the shooting. Alicia Hill testified that she noticed a car stop on Griffin Road and observed two men run from behind the car; one man jumped on a bicycle, the other man jumped into the rear, driver's side of the car. The car then continued west on Griffin and the bicycle turned onto a side street. Hill claims she subsequently noticed Antoine Jones hiding in the bushes *984 near his grandmother's house and that he said Bryant committed the shooting. However, on cross-examination, she admitted that she did not hear any gunshots, that she did not know who shot the victims, and that she knew Jones has changed his story several times, the most recent of which implicated Woods.
The jury convicted Woods of the murder of Clarence Langford and attempted murder of Pamela Langford. Following the penalty phase of the trial, the jury recommended death by a vote of eight to four. In sentencing Woods to death, the trial court found two aggravating factors, (1) previous conviction of a crime involving the use of violence against another person (the contemporaneous shooting of Mrs. Langford), and (2) the murder was committed in a cold, calculated and premeditated manner (CCP); one statutory mitigating factor, Woods' age of twenty-four years which it gave moderate weight, and seven non-statutory mitigators. The court found: (1) that Woods suffers from learning disabilities ("some weight"); (2) that he suffers from borderline intellectual functioning due to an I.Q. of 77 ("little weight"); (3) that Woods provided parental responsibility to his two daughters ("little weight"); (4) that Woods assisted in raising his siblings ("little weight"); (5) that Woods had a difficult childhood without influence of a father figure ("little weight"); (6) that Woods has no convictions for violent offenses prior to the present crime ("moderate weight"); and (7) that Woods assisted law enforcement officers in the investigation of an unrelated carjacking and murder ("moderate weight").

APPEAL
Woods raises eight issues for our review.[4]

Motion for Judgment of Acquittal
Woods initially argues the trial court erred in denying his motion for judgment of acquittal because the State's case rested entirely on circumstantial evidence and that insufficient evidence of premeditation existed to submit this case to the jury. He further claims that the only evidence of what transpired on the night of the murder came from Mrs. Langford and she did not see what happened immediately prior to the shooting. The State, on the other hand, contends Woods failed to preserve this issue for review because the grounds raised on appeal are not the specific legal grounds argued to the court below. Rather, during trial, defense counsel merely claimed the State had failed to establish prima facie evidence of guilt without providing any grounds or legal argument in support.
To preserve an argument for appeal, it must be asserted as the legal ground for the objection, exception, or motion below. See Archer v. State, 613 So.2d 446, 448 (Fla.1993); Steinhorst v. State, 412 So.2d 332, 338 (Fla.1982). Florida Rule of Criminal Procedure 3.380 requires that a motion for judgment of acquittal "fully set forth the grounds on which it is based." See Fla. R.Crim. Pro. 3.380(b) (emphasis added). Here, Woods submitted a boilerplate motion for acquittal without fully setting forth the specific grounds upon which the motion was based. He did *985 not bring to the attention of the trial court any of the specific grounds he now urges this Court to consider.
In any event, upon review of the record, we find no error. In Gordon v. State, 704 So.2d 107 (Fla.1997), we reemphasized the standard courts must apply in considering motions for judgment of acquittal:
We have repeatedly reaffirmed the general rule established in Lynch v. State, 293 So.2d 44 (Fla.1974), that:
[C]ourts should not grant a motion for judgment of acquittal unless the evidence is such that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law.
Id. at 45; see Gudinas v. State, 693 So.2d 953 (Fla.1997), cert. denied, ___ U.S. ___, 118 S.Ct. 345, 139 L.Ed.2d 267 (1997); Barwick v. State, 660 So.2d 685 (Fla.1995); DeAngelo v. State, 616 So.2d 440 (Fla.1993); Taylor v. State, 583 So.2d 323 (Fla.1991). In circumstantial evidence cases, "a judgment of acquittal is appropriate if the State fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt." Barwick, 660 So.2d at 694.
Therefore, at the outset, "the trial judge must first determine there is competent evidence from which the jury could infer guilt to the exclusion of all other inferences." Barwick, 660 So.2d at 694. After the judge determines, as a matter of law, whether such competent evidence exists, the "question of whether the evidence is inconsistent with any other reasonable inference is a question of fact for the jury." Long v. State, 689 So.2d 1055, 1058 (Fla.1997).
Gordon, 704 So.2d at 112-13; see also State v. Law, 559 So.2d 187, 188-89 (Fla. 1989) (applying circumstantial evidence rule to determination of motion for judgment of acquittal). On review, we must view the conflicting evidence in a light most favorable to the state. See Peterka v. State, 640 So.2d 59, 68 (Fla.1994). So long as competent, substantial evidence supports the jury's verdict, it will not be overturned on appeal. Id.
Premeditation is defined as more than a mere intent to kill; it is a fully formed conscious purpose to kill. This purpose may be formed a moment before the act but must exist for a sufficient length of time to permit reflection as to the nature of the act to be committed and the probable result of that act.
Wilson v. State, 493 So.2d 1019, 1021 (Fla. 1986). Premeditation may be established by circumstantial evidence. See id.; Holton v. State, 573 So.2d 284, 289 (Fla.1990). Such evidence of premeditation includes "the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted." Spencer v. State, 645 So.2d 377, 381 (Fla.1994).
Although Mrs. Langford did not witness Woods pull the trigger, the record discloses sufficient evidence from which the jury could infer premeditated design to the exclusion of all reasonable hypotheses of innocence. The record indicates that prior to the murder Woods obtained a bill of sale, upon which he forged Mr. Langford's signature. Woods then insisted that both Langfords meet him at the library apparently under the pretense of signing and notarizing the bill of sale. From there, Woods directed them to a desolate area where he shot them multiple times with a weapon that he had procured in advance of the homicide. Indeed, several witnesses testified that they had seen Woods with a small-caliber firearm both on the day of and prior to the murder.[5]
*986 We also initially note that in this case, the record discloses direct evidence of an unlawful killing. See Davis v. State, 90 So.2d 629, 631 (Fla.1956) ("Direct evidence is that to which the witness testifies of his own knowledge as to the facts at issue."). Mrs. Langford testified that Woods was the person to whom her husband had agreed to sell the car and that Woods was the person who shot both her and her husband. Furthermore, after the incident, Mrs. Langford told a passerby who had stopped to assist her that "Terry did this... Terry did this." At the hospital, Mrs. Langford selected Woods from a photo-lineup as the person who shot her and her husband.
The fact that Woods presented contradictory evidence as to guilt does not necessarily mandate reversal because the circumstantial evidence rule does not require the jury to believe the defendant's version of the facts where the State has produced conflicting evidence. See Spencer, 645 So.2d at 381; DeAngelo, 616 So.2d at 442; Holton, 573 So.2d at 289-90. Once competent evidence has been submitted to the jury, determining the credibility of witnesses is solely within the province of the jury, see Davis v. State, 703 So.2d 1055, 1060 (Fla.1997), cert. denied, ___ U.S. ___, 118 S.Ct. 2327, 141 L.Ed.2d 701 (1998); Terry v. State, 668 So.2d 954, 962 n. 9 (Fla.1996); Holton, 573 So.2d at 290; cf. Carter v. State, 560 So.2d 1166, 1168 (Fla.1990) (noting that credibility of accomplices' version of murder is question for jury), and its findings will not be disturbed on appeal absent a clear showing of error. See Jent v. State, 408 So.2d 1024, 1028 (1981), modified on other grounds, Preston v. State, 444 So.2d 939 (Fla.1984). After hearing all of the evidence in this case, the jury clearly chose not to believe Woods' version of the facts. Accordingly, we find no error in the denial of Woods' motion for judgment of acquittal; the question of premeditation was properly submitted to the jury.[6] Further, upon review of the entire record in this case, see § 921.141(4), Fla. Stat. (1997); Fla. R.App. P. 9.140(h), we find the above-mentioned evidence sufficient to support Woods' convictions.

Hearsay Evidence
Woods also claims the trial court erred in permitting Mrs. Langford to testify to statements made by her husband in relation to the sale of the car. Over defense counsel's objection, the State asked Mrs. Langford what her husband's intentions were with regard to the method of payment for the sale of the car.[7] The trial court allowed Mrs. Langford to respond on the ground the testimony was relevant to *987 the state of mind of the declarant, Mr. Langford. Woods claims this testimony constitutes inadmissible hearsay because Mr. Langford's state of mind is not at issue in this case. The State, on the other hand, argues Woods waived this claim for appellate purposes because defense counsel failed to make the specific objection Woods now raises on appeal.
The State correctly points out that defense counsel objected to the testimony on the rather vague ground that the witness could not testify as to her husband's intent. However, both the trial court and the State considered the objection as if it had been raised on hearsay grounds. Indeed, the trial court overruled the objection on the ground the testimony went to the state of mind of the declarant, and, therefore, constituted an exception to the hearsay rule. Accordingly, we find this issue has been preserved for review.
As for the merits of the claim, the State argues that Mr. Langford's state of mind was at issue because of a dispute between the State and defense over what events took place leading up to the murder. Further, the State asserts that Mr. Langford's state of mind at the time he reopened negotiations with Woods for the sale of the car-i.e., that Mr. Langford would not sell the car to Woods until Woods had the entire amount-is relevant to the sequence of events leading to the murder and the reason the Langfords agreed to meet Woods at the library on the night of the homicide. We disagree.
Hearsay is defined as a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." See § 90.801(1)(c), Fla. Stat. (1995). Section 90.803(3)(a) of the Florida Statutes provides an exception to the hearsay rule:
(3) THEN-EXISTING MENTAL, EMOTIONAL, OR PHYSICAL CONDITION.
(a) A statement of the declarant's then-existing state of mind, emotion, or physical sensation, including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health, when such evidence is offered to:
1. Prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when such state is an issue in the action.
2. Prove or explain acts of subsequent conduct of the declarant.
§ 90.803(3)(a)1.-2., Fla. Stat. (1995). Under the state of mind exception, the out-of-court statements by the declarant may not be used to prove the state of mind or motive of the defendant. See Hodges v. State, 595 So.2d 929, 931-32 (Fla.), vacated on other grounds, 506 U.S. 803, 113 S.Ct. 33, 121 L.Ed.2d 6 (1992); Downs v. State, 574 So.2d 1095, 1098 (Fla.1991); Charles W. Ehrhardt, Florida Evidence § 803.3a, at 649 (1998 ed.). As Woods correctly points out, under section 90.803(3)(a)1., a homicide victim's state of mind prior to the fatal event generally is neither at issue nor probative of any material issue raised in the murder prosecution. See Kelley v. State, 543 So.2d 286, 288 (Fla. 1st DCA 1989); Fleming v. State, 457 So.2d 499, 501 (Fla. 2d DCA 1984); see also Correll v. State, 523 So.2d 562, 565-66 (Fla.1988). The only exceptions to this rule are where the victim's state of mind goes to a material element of the crime, see Peede v. State, 474 So.2d 808, 816 (Fla.1985) (holding victim's state of mind relevant to show she was forcibly abducted against her will); Pacifico v. State, 642 So.2d 1178, 1185 (Fla. 1st DCA 1994) (holding state of mind of victim relevant to show she did not consent to sexual intercourse in trial for sexual battery), or where the evidence rebuts a defense raised by the defendant, see State v. Bradford, 658 So.2d 572, 574-75 (Fla. 5th DCA 1995). Testimony that the murder victim feared the defendant may also be admissible under the state of mind exception where the defendant (1) claims self-defense; (2) claims the victim committed *988 suicide; or (3) claims the death was accidental. See Peterka, 640 So.2d at 69; Kingery v. State, 523 So.2d 1199, 1202 (Fla. 1st DCA 1988); Kennedy v. State, 385 So.2d 1020, 1021-22 (Fla. 5th DCA 1980). However, none of these exceptions exist here.
Mr. Langford's reasons for demanding lump sum payment and for meeting Woods at the library is not at issue in this case. Rather, it is Woods' state of mind that is material. In other words, the State has the burden of proving that Woods unlawfully killed the victim with premeditated design. Through this testimony, the State apparently sought to establish the reason the Langford's met with Woods on the night of the murder. Unfortunately, Mr. Langford's reason for meeting Woods does not establish what purpose Woods had for meeting the victims that night. Therefore, the trial court erred in allowing Mrs. Langford to attest to her husband's intent because Mr. Langford's state of mind was not at issue in this case.
Nevertheless, we find the error harmless in light of the extensive evidence at trial concerning the circumstances and purpose of the Langfords' meeting with Woods. Mrs. Langford testified that Woods called her home on the night of the murder, told her that he had the money for the car and a bill of sale for them to sign, and asked both her and her husband to meet him at the library. Two other witnesses testified that on the night of the shooting incident, Mrs. Langford told them that "Terry" had shot her and that she and her husband had met him for the purpose of selling their car to him. Thus, any prejudice arguably caused by the introduction of Mr. Langford's statement was mitigated and reduced to harmlessness beyond a reasonable doubt by this other evidence.

Motion for New Trial
Woods argues the trial court erred in denying his motion for new trial based on newly discovered evidence of innocence. At the hearing on the motion, Woods presented Cynquette Bryan, who testified that she witnessed the shooting and that Tim Bryant was the shooter. Woods claims that the trial court erred in not concluding that her testimony mandates a new trial. We disagree.
Rule 3.600 of the Florida Rules of Criminal Procedure states that courts shall grant a new trial where "[n]ew and material evidence, which, if introduced at trial would probably have changed the verdict or finding of the court, and which the defendant could not with reasonable diligence have discovered and produced at the trial, has been discovered." Fla. R.Crim. Pro. 3.600(a)(3). Under this rule, "[a] new trial will not be awarded on the basis of newly discovered evidence unless the evidence was discovered after trial, unless due diligence was exercised to have such evidence at the former trial, unless the evidence goes to the merits of the cause and not merely to impeach a witness who testified, unless the evidence is not cumulative, and unless it is such that it probably would have changed the verdict." Clark v. State, 379 So.2d 97, 101 (Fla. 1979); see also Parker v. State, 641 So.2d 369, 376 (Fla.1994); Freeman v. State, 547 So.2d 125, 128 (Fla.1989), abrogated on other grounds, Fenelon v. State, 594 So.2d 292 (Fla.1992); McVeigh v. State, 73 So.2d 694, 698 (Fla.1954); see generally Jones v. State, 709 So.2d 512, 521 (Fla.1998) (stating similar rule for new trial based on newly discovered evidence in postconviction proceedings); State v. Spaziano, 692 So.2d 174, 177 (Fla.1997) (same). Absent an abuse of discretion, a trial court's order denying a motion for new trial will not be disturbed on appeal. See Jones, 709 So.2d at 515; Spaziano, 692 So.2d at 178.
In Parker, we reviewed the trial court's denial of the defendant's motion for a new trial based on a newly discovered witness who observed a deputy shoot the victim. We summarized the witness's testimony as follows:

*989 The witness testified that the deputy that shot the victim was six feet two inches tall, weighed 220 to 230 pounds, had black curly hair, and wore wirerimmed glasses. Although the physical appearances of deputies McNesby and Killen are not stated in the record, this description obviously did not match either of them. The witness also said that Parker was wearing a dark jacket, while all the other witnesses said it was tan or light brown. The witness said the victim was wearing a green army jacket, army boots, and a green plaid flannel shirt. In fact, the victim was wearing an orange tee shirt and sandals.
641 So.2d at 376 n. 10. Based on this testimony, the trial court denied the motion because "the testimony was `so inconsistent, incredible, uncredible, and unworthy of belief that it is in effect discarded in its entirety by the Court.'" Id. at 376. On appeal, we affirmed the order of denial:
As we have stated before, "the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial" to be sufficient to require reversal. Jones v. State, 591 So.2d 911, 915 (Fla.1991). As the court decided, Parker's "new" evidence did not meet this standard. Parker has shown no abuse of discretion in the trial court's ruling, and we will not disturb its determination of this issue. Jent v. State, 408 So.2d 1024 (Fla.1981), cert. denied, 457 U.S. 1111, 102 S.Ct. 2916, 73 L.Ed.2d 1322 (1982); Stone v. State, 616 So.2d 1041 (Fla. 4th DCA 1993).
Id.
In this case, Woods' entire defense theory was that he was at home at the time of the killing and that Bryant committed the murder. Bryan's testimony, however, differed little from the other evidence presented by the defense during the guilt phase of the trial. She claimed that while walking west on Griffin Road, she saw a car parked on the road and heard three gunshots. Bryan then saw a tall, dark-skinned, bald, African American male get out of the car and run. Although she initially identified this man as "Kevin," Bryan later claimed that Tim Bryant was the person she saw shoot the victims. The State, however, pointed to several inconsistencies within Bryan's testimony.
For example, Bryan initially identified the shooter as "Kevin" but admitted on cross-examination that she changed her identification to Tim Bryant as the shooter only after defense counsel's repeated questioning during deposition as to whether it was possible that Bryant was the shooter. At the hearing, Bryan claimed that she could not determine the color of the car because it was too dark and that she did not look to see who was inside the car. When asked how she knew the victim was a lady if she did not look inside the car, Bryan responded that she heard the lady scream. However, Mrs. Langford testified that she did not scream that night. Bryan also admitted that she initially told the police that she only heard two gunshots, noticed the victim's car in a ditch, and saw the man exit the car from the rear, driver's side of the car and run north, away from the car. The evidence at trial indicated that at least five shots were fired, that the car was parked on the road, not in a ditch, and that the assailant exited the vehicle from the rear, passenger side of the car. At the hearing, the State also pointed out that according to Mrs. Langford, the shooter ran south down the road, not north. Finally, Bryan testified that after witnessing the shooting, she went to a friend's house and then took a taxicab home. However, the State submitted taxicab records showing that no pick-ups or drop-offs were made that night at the two addresses provided by Bryan.
Based on these inconsistencies, the trial court denied the motion on the grounds the witness lacked credibility and that Woods failed to carry his burden to demonstrate that this testimony would have changed the result of the trial. We find no *990 error in the trial court's denial of Woods' motion for new trial.[8]

Penalty Phase and Proportionality
As to the penalty phase of the proceedings, Woods challenges the finding of the CCP aggravator and the proportionality of his sentence of death. It is axiomatic that the death penalty is reserved for only the most aggravated and the least mitigated of first-degree murders. See Urbin v. State, 714 So.2d 411, 416 (Fla. 1998); State v. Dixon, 283 So.2d 1, 7 (Fla. 1973). As such, in reviewing a sentence of death, this Court must consider the particular circumstances of the instant case in comparison to other capital cases and then decide if death is the appropriate penalty in light of those other decisions. See Urbin, 714 So.2d at 416; Hunter v. State, 660 So.2d 244, 254 (Fla.1995). We explained this principle in Tillman v. State, 591 So.2d 167 (Fla.1991):
We have described the "proportionality review" conducted by this Court in every death case as follows:
Because death is a unique punishment, it is necessary in each case to engage in a thoughtful, deliberate proportionality review to consider the totality of circumstances in a case, and to compare it with other capital cases. It is not a comparison between the number of aggravating and mitigating circumstances.

Porter v. State, 564 So.2d 1060, 1064 (Fla.1990) (citation omitted) (emphasis added), cert. denied, 498 U.S. 1110, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991). Accord Hudson, 538 So.2d at 831; Menendez v. State, 419 So.2d 312, 315 (Fla. 1982). The requirement that death be administered proportionately has a variety of sources in Florida law, including the Florida Constitution's express prohibition against unusual punishments. Art. I, § 17, Fla. Const. It clearly is "unusual" to impose death based on facts similar to those in cases in which death previously was deemed improper. Id. Moreover, proportionality review in death cases rests at least in part on the recognition that death is a uniquely irrevocable penalty, requiring a more intensive level of judicial scrutiny or process than would lesser penalties. Art. I, § 9, Fla. Const.; Porter.

Proportionality review also arises in part by necessary implication from the mandatory, exclusive jurisdiction this Court has over death appeals. Art. V, § 3(b)(1), Fla. Const. The obvious purpose of this special grant of jurisdiction is to ensure the uniformity of death-penalty law by preventing the disagreement over controlling points of law that may arise when the district courts of appeal are the only appellate courts with mandatory appellate jurisdiction. See id. Thus, proportionality review is a unique and highly serious function of this Court, the purpose of which is to foster uniformity in death-penalty law.
Id. at 169; accord Urbin, 714 So.2d at 416-17; Sinclair v. State, 657 So.2d 1138, 1142 (Fla.1995).
First, we conclude that Woods is correct in his assertion that the trial court erred in finding that the State had proved beyond a reasonable doubt that the murder was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification. The *991 evidence is simply unclear on this aggravator and as to what happened at the time of the murder. Indeed, one is required to speculate as to exactly what happened. While the proof may have been sufficient to go to the jury on first-degree murder, it was not sufficient to establish CCP.
To establish CCP:
[T]he jury must first determine that the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); and that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated); and that the defendant exhibited heightened premeditation (premeditated); and that the defendant had no pretense of moral or legal justification.
Gordon, 704 So.2d at 114 (quoting Jackson v. State, 648 So.2d 85, 89 (Fla.1994)). In Gordon, we noted that "while CCP can be established by circumstantial evidence, it `must be inconsistent with any reasonable hypothesis which might negate the aggravating factor.'" Id. (quoting Geralds v. State, 601 So.2d 1157, 1163 (Fla.1992)). The tragic events in this case apparently arose from confusion and frustration surrounding the simple purchase of an automobile. The killing occurred at the hands of a man with limited mental ability who apparently did not comprehend the nature of the transaction and its legal ramifications, especially the need for title and registration. Evidence at trial showed that Woods called the police several times seeking their assistance in obtaining the car which he claimed to have paid for and which he believed rightfully belonged to him, notwithstanding the fact that he did not yet possess title to the car. It appears that due to his limited mental ability, Woods resorted to violence upon the irrational belief the Langfords were wrongfully keeping the car from him despite his efforts to complete the purchase. We find the evidence insufficient to support CCP.
When the CCP aggravator is removed from the sentencing equation, we are left with a single aggravator and substantial mitigation. We have rarely approved a death sentence with a single aggravator involving a contemporaneous felony and substantial mitigation, and we cannot do so under the circumstances of this case. See Songer v. State, 544 So.2d 1010 (Fla.1989). In light of Woods' borderline intelligence, his lack of violent criminal activity prior to the present crime, and the other substantial evidence offered in mitigation, we conclude that this case does not constitute one of the most aggravated and least mitigated of first-degree murders.[9]See Sinclair, 657 So.2d at 1142 (finding death disproportionate where defendant's dull normal intelligence, lack of father figure, and cooperation with police outweighed single aggravating factor of murder committed during course of a robbery).
In Sinclair, the defendant robbed and fatally shot a cab driver. He was convicted of first-degree murder and sentenced to death. The trial court found one aggravating factor (murder committed while engaged in the commission of a felony) and three nonstatutory mitigating factors: (1) Sinclair cooperated with the police; (2) Sinclair has a dull normal intelligence level; and (3) Sinclair was raised without a father figure. In light of these mitigating *992 factors, and in addition to other evidence in the record of Sinclair's low intelligence and emotional disturbances which we noted carried substantial weight, this Court held that death would be a disproportionate penalty. 657 So.2d at 1142.
We find the facts and circumstances in this case very similar to those in Sinclair. Indeed, the same circumstances that mitigated the sentence of death in Sinclair exist in the instant case, in addition to several others. The trial court found that Woods' age of twenty-four years mitigated this offense, that he has learning disabilities, that he suffers from borderline intellectual functioning due to an I.Q. of only seventy-seven,[10] that Woods provides support for his two daughters, that Woods assisted in raising his siblings, that Woods had a difficult childhood without the influence of a father figure, that Woods has no prior convictions for violent offenses, and that Woods assisted law enforcement officers in the investigation of an unrelated carjacking and murder. Of these factors, we find most significant the fact that Woods suffers from low intelligence and that he has lived a life free of violent crimes up until the offense in the instant case.

CONCLUSION
For the foregoing reasons, we affirm Woods' convictions of first-degree murder and attempted first-degree murder, but reverse his sentence of death. This case hereby is remanded to the trial court with instructions to impose a sentence of life imprisonment without possibility of parole.
It is so ordered.
HARDING, C.J., SHAW, WELLS, ANSTEAD and PARIENTE, JJ., and OVERTON, Senior Justice, concur.
NOTES
[1] Woods told Mrs. Langford that he had already paid a notary ten dollars to notarize the bill of sale that night. However, other testimony at trial indicated that prior to this conversation with Mrs. Langford, Woods had asked a notary to authorize the bill of sale, but the notary had refused because the bill already had been signed.
[2] Two witnesses, Jamie and Wesley Tsai, testified that in late May, Woods obtained a bill of sale from them for the purchase of an automobile. Woods gave the Tsais a piece of paper containing the information concerning the sale. Wesley Tsai testified that after Jamie typed the bill of sale, he observed Woods place the bill and the piece of paper together and write on the bill of sale. At trial, Mrs. Langford testified that the signature on the bill was not her husband's and an expert in handwriting analysis opined that the signature on the bill indicated a forgery. Indeed, both "Clarence" and "Chevrolet" had been misspelled.
[3] Another witness, Dewayne Jones, testified that while in jail, he heard Bryant and Woods discussing the shooting. According to Dewayne, Bryant said, "Well I ain't worrying about it no way, because they're not going to give the two-five." Two-five is slang for a .25 caliber pistol.
[4] The claims include: (1) the trial court erred in denying Woods' motion for judgment of acquittal where the State failed to prove premeditation beyond a reasonable doubt; (2) Woods' death sentence is disproportionate; (3) the trial court erred in denying Woods' motion for a new trial based on newly discovered evidence; (4) the trial court improperly balanced the aggravating factors against the mitigating factors; (5) the trial court erred in instructing the jury on the pecuniary gain aggravating factor; (6) the trial court erred in finding that the murder was committed in a cold, calculated and premeditated manner without any pretense of moral or legal justification where the finding is unsupported by the evidence; (7) the trial court improperly admitted hearsay evidence; and (8) Wood's death sentence is unconstitutional because it is based on a mere majority vote. Because we are reversing Woods' sentence of death, issues (4), (5), and (8), which relate to the penalty phase of the trial, are now moot.
[5] The Tsais both testified that Woods showed them a small caliber automatic firearm. Another witness, Willy Atkins, testified that he saw Woods with a small-caliber firearm on the day of the murder. Greg Markland testified that he saw Woods with a .25-caliber firearm two or three days before the murder. Markland testified that Woods had asked him if anyone wanted to buy a gun.
[6] Woods urges this Court to consider as a reasonable hypothesis of innocence the fact that Woods' actions on the night of the murder resulted from an impulsive act or mental disorder. However, this hypothesis was not presented to the jury and Woods does not offer any factual support for this claim on appeal. Rather, Woods' sole line of defense at trial was that he was home at the time of the murder and that someone else committed the killing.
[7] During trial, the following colloquy occurred:

[Prosecutor]: This time around, was it your husband's intention to receive installments again?
[Defense Counsel]: Your honor, at this time I would object to that, as to whether this witness can testify in regards to her husband's intentions.
[Prosecutor]: I believe that that would be an exception to the hearsay rule, pertaining to state of mind.
[The Court]: I agree. Overruled. You can answer ma'am.
[P. Langford]: I'm sorry, would you ask that again?
[Prosecutor]: Yes, it's a difficult question. Do you know if your husband intended this time to continue as he had before, or did this time he intend to receive lump-I mean installment payments, but insist upon one lump sum?
[P. Langford]: Right. He said, when you have all the money Terry, come and let me know.
[8] In addition, we find the trial court could have denied the motion because of defense counsel's failure to act diligently in discovering this evidence. At the hearing, defense counsel claimed that during trial, Woods' mother told him that a woman by the name of Angela Smith told her that Bryan claimed to have seen the shooting and that Woods was not the shooter. Mrs. Smith was the mother of one of the witnesses at trial. The trial court found that defense counsel was aware of this witness before counsel presented closing arguments and before the jury was excused for deliberations but that defense counsel failed to notify the court of the existence of this witness or post-pone the proceedings in order to offer her testimony. Notwithstanding these findings, the trial court denied the motion on grounds of lack of credibility.
[9] We have considered our decisions in Hunter v. State, 660 So.2d 244 (Fla.1995), and Jones v. State, 690 So.2d 568 (Fla.1996), both of which were cited by the State in support of the imposition of the death penalty in this case. However, we find both cases to be distinguishable. In Hunter, we upheld the sentence of death based on the existence on two aggravating factors, one of which was based on twelve prior violent felonies, four of which were prior felonies, and eight of which were contemporaneous felonies. See Hunter, 660 So.2d at 254. In Jones, we upheld the death sentence because the three aggravating circumstances outweighed the mitigating evidence that Jones came from a loving, supportive background and showed no signs of material, spiritual, or moral privation. 690 So.2d al 572. Unlike the evidence in Jones, however, the mitigating evidence in this case is far more substantial.
[10] In addition, Dr. Karen Estill, the expert who evaluated Woods, testified that he sight reads on a high school level, spells on a fourth grade level, and does math on a third grade level. Dr. Estill also testified that Woods suffers from low self-esteem.