# Supreme Court of Florida

_____

No. SC13-1632
_____

**RICHARD P. FRANKLIN,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[November 23, 2016]

PER CURIAM.

This case is before the Court on appeal from a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons discussed below, we affirm the conviction, vacate the sentence of death, and remand for a new capital sentencing proceeding.

**STATEMENT OF THE CASE & FACTS**

Richard Franklin appeals his conviction and sentence for the first-degree murder of Sergeant Ruben Thomas. At all relevant times, Franklin was an inmate at the Columbia Correctional Institution (CCI), Annex Unit in Columbia County,

Florida. He was serving life sentences for prior convictions of first-degree murder and armed robbery with a firearm as well as a term of years for a prior conviction of aggravated battery with a firearm. Franklin was residing in room 3206 on the second floor of Quad 3, T Dorm. Two or three months before the murder in question, Franklin's cellmate, Robert Acree, sold Franklin the murder weapon: a 10.5 inch by 1.5 inch shank or knife.

Thomas was a corrections officer at CCI. On the night of his murder, Thomas was working the 4 p.m. to 12 a.m. shift in T Dorm as the dorm sergeant. He and dorm Officer Bradley Myer were stationed in the officer's station or control room. The officer's station was surrounded by a large octagon-shaped sallyport or vestibule that, in turn, separated the officer's station from the four surrounding quads where the inmates resided. There was an additional area within the sallyport that separated the sallyport from the entrance to the officer's station, with an outer swinging door leading into the additional area and an inner door leading from that area into the officer's station. Because the control consoles for T Dorm's quads were located in the officer's station, at least one officer always had to be present in the officer's station in order to operate the controls.

On March 18, 2012, shortly after the 10:30 p.m. master count of the inmates, Franklin removed from the air vent in his cell a piece of cardboard that typically was used to control the cell's temperature. He then used the Quad 3 intercom to

summon Thomas to the cell under the false pretense that water was leaking from the vent. Thomas informed Myer that he was going to inspect an inmate's cell. Once Thomas entered Quad 3, he generally inquired about who had water coming from their vent, to which Franklin responded, "Up here, Sarge," and called out his cell number.

Thomas approached the cell, and Franklin called him to the back to look up at the vent. Witnesses testified that Thomas was carrying a bag of potato chips at that time and did not appear prepared to fight. The record generally reflects that either as Thomas was inspecting the vent or as soon as he looked back down, Franklin punched him in the face, breaking his nose and causing it to bleed "real bad." A brief tussle ensued, during which time Franklin hit Thomas in the stomach and chest area and knocked Thomas's radio out of his hand. Thomas's panic button also ended up on the floor.

Thomas managed to disengage himself and flee from the cell. Myer testified that he saw Thomas running across the second-floor catwalk toward the front of the quad, down the staircase, out the quad's sliding entrance door, and toward the outer officer's station door in the sallyport. By the time Thomas reached the bottom of the staircase, Franklin emerged from the cell while brandishing his shank and ran or "fast walked" in the same direction as Thomas. The sliding

entrance door was closing, but Franklin managed to capture it and push it back far enough to squeeze through into the sallyport.

As Thomas approached the officer's station, he hollered, "back door, back door," meaning for Myer to unlock the outer door to the officer's station. Myer complied and simultaneously radioed for backup. Once Thomas got through the outer door, he tried to close it. However, Franklin caught up and wedged his foot in the doorway to prevent the door from shutting and locking. Franklin testified that he initially did not think he would catch Thomas, but when he was able to wedge the outer door, he got excited and thought to himself, "I got you," and that he had an opportunity to "whup [Thomas's] ass."

A struggle over the outer door ensued; Thomas tried to pull the door closed while Franklin attempted to force it open. Each time the door opened, Franklin struck at Thomas with the shank in a downward motion. Inmate Samuel Selig specifically recalled Franklin burying the shank into Thomas' neck, causing blood to squirt inside the vestibule area just outside the officer's station. He also recalled the outer door eventually closing, after which Thomas fell to his hands and knees, coughed up blood, and rolled over onto his back. The struggle lasted approximately thirty seconds.

By that time, inmates in each quad had gathered on the quad windows in observation. They began beating on the glass and hollering. Franklin

subsequently walked around the vestibule and made a cutthroat gesture with his right thumb toward the inmates. He then entered Quad 2.[1]

Captain Michelle Nipper responded to the annex. Upon arriving at T Dorm, she ordered the officers to lock down the inmates in each quad. A standoff at the Quad 2 door eventually began between Franklin and the corrections officers; Franklin was locked inside the quad, and the officers were gathering in front of the quad door within the vestibule. At some point, Franklin brandished his shank and a canister of pepper spray. Captain Nipper ordered Franklin to relinquish the items and surrender, but he refused. Franklin removed prison uniforms from a laundry bag, tied them together, and fastened the garments to the outside of the showers and the fire exit door to prevent the officers from entering the quad through that door. He returned to the quad's front door, bellowed to Nipper, "Bitch, you ain't taking me alive," and violently shook the door.

Shortly thereafter, the Designated Armed Response Team or "DART" members arrived at T Dorm. Franklin entered cell 2108 on Quad 2's first floor and broke the sprinkler head, causing the fire alarm and strobe lights to activate.

---

1. The record reflects that several events relevant to Franklin's other convictions occurred while he was in Quad 2. Chiefly, he sucker punched Officer William Brewer, crushing his orbital socket and causing partial vision loss in his right eye. Franklin also confiscated Brewer's pepper spray canister.

Because water erupted from the sprinkler system, an ankle-high flood filled the quad and vestibule.

Additional officers, along with Assistant Warden Tony Anderson, had arrived at Quad 2's front entrance by that time. Franklin continued to disobey the officers' orders to relinquish his weapons and surrender himself. One of the officers sprayed Franklin with chemical gas through a porthole in the quad door in an attempt to force him to relinquish the weapons. Franklin wiped his face off and said in a "pissed off" manner, "I'm going to get another one of y'all, y'all come on. I'm ready for you." Franklin also attempted to spray the officers with his canister of pepper spray but ran out.

Using a non-lethal round, a DART member shot Franklin in the upper torso. Franklin fell to the floor and dropped his shank and pepper spray. The officers then rushed into the quad, administered more of the chemical gas, and apprehended Franklin.

Thomas died as a result of a laceration wound almost three inches in depth to the left side of his neck. The jugular vein and small blood vessels from the subclavian artery were cut. Thomas's left lung was punctured, and as a result, one fifth of his blood filled the left chest cavity and caused the lung to collapse. Thomas also sustained incised wounds on the right side of his face and the left

scalp, a fractured temporal bone, eight sharp-force defensive wounds on his arms, and at least fourteen blunt-force defensive wounds to other parts of his body.

On June 19, 2013, a jury convicted Franklin of first-degree premeditated murder.[2] During the penalty phase, the State presented evidence of Franklin's prior convictions and also permitted Thomas's mother and his fiancée to read prepared victim impact statements. The defense called Franklin's father and sister in mitigation. Franklin also testified in his defense, during which he explained the circumstances surrounding his prior convictions. The jury ultimately recommended a sentence of death by a nine-to-three vote.

Following a Spencer[3] hearing, the trial court, on August 2, 2013, sentenced Franklin to death.[4] In imposing the death sentence, the trial court found five aggravating factors,[5] no statutory mitigating factors, and seven nonstatutory

---

2. Franklin was also charged with one count of possession of contraband by an inmate and one count of aggravated battery on a law enforcement officer in connection with him striking Officer Brewer in Quad 2. He was convicted as charged on the first count and, as to the second, convicted of the lesser included offense of felony battery.

3. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

4. The trial court also sentenced Franklin to terms of years of five and fifteen years for the felony battery and possession of contraband convictions, and ordered all of the sentences to run consecutively to each other and to the sentences imposed for Franklin's prior convictions.

5. The aggravators were: (1) previously convicted of a felony and under a sentence of imprisonment or placed on community control or on felony

mitigating factors.[6] It concluded "that the aggravating factors clearly, convincingly, and beyond a reasonable doubt outweigh the mitigating factors. In fact, the mitigating evidence 'is minimal and does not come close to outweighing the aggravating factors.' " This appeal follows.

## ANALYSIS

### Sufficiency of the Evidence

Franklin chiefly argues that the record does not support his conviction of first-degree murder. He admits that he murdered Thomas using a homemade shank but contends that the evidence presented at trial failed to show a premeditated design to kill him. In every capital case involving the imposition of the death penalty, this Court independently reviews the record to ensure there was sufficient

probation—great weight; (2) prior violent felony conviction—great weight; (3) capital felony was committed to disrupt or hinder the lawful exercise of any governmental function—substantial weight; (4) the murder was especially heinous, atrocious, or cruel—very great weight; and (5) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification—very great weight. The trial court also found an additional aggravating circumstance—the victim was a law enforcement officer engaged in the performance of his official duties—but merged it with the disrupt/hinder aggravator.

6. Regarding the nonstatutory mitigators, the trial court found that Franklin: (1) had a childhood and adolescent years that were troubled, unstable, and violent—little weight; (2) was a great brother and uncle—little weight; (3) suffered a head injury from a gunshot wound as a teenager—some weight; (4) was effectively abandoned by his family—little weight; (5) intervened when a fellow inmate was being attacked—some weight; (6) exhibited good behavior during trial—little weight; and (7) exhibited remorse—very little weight.

evidence to sustain the conviction. Dausch v. State, 141 So. 3d 513, 517 (Fla. 2014). There was sufficient evidence to sustain a conviction "if, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt." Johnston v. State, 863 So. 2d 271, 283 (Fla. 2003) (citing Banks v. State, 732 So. 2d 1065 (Fla. 1999)); see also Dausch, 141 So. 3d at 517 (outlining elements of first-degree premeditated murder); § 782.04(1)(a)1., Fla. Stat. (2012).

According to this Court's precedent,

[p]remeditation is defined as more than a mere intent to kill; it is a fully formed conscious purpose to kill. This purpose may be formed a moment before the act but must exist for a sufficient length of time to permit reflection as to the nature of the act to be committed and the probable result of that act.

Bradley v. State, 787 So. 2d 732, 738 (Fla. 2001) (quoting Woods v. State, 733 So. 2d 980, 985 (Fla. 1999)). Premeditation may be inferred from circumstantial evidence such as "the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted." Id. We have deemed evidence sufficient to support a finding of premeditation where it demonstrated a break between an initial crime and the ultimate decision to kill the victim. See Miller v. State, 42 So. 3d 204, 228 (Fla. 2010) ("Miller's statements that there was a break between his initial struggle with

Smith during the attempted robbery and the ultimate decision to fatally stab her indicate that he was conscious of the nature of the act he was about to commit and the probable result of that act.").

Applying these principles, we conclude that the evidence in this case sufficiently demonstrates a premeditated killing. Regarding the nature of the murder weapon, Franklin killed Thomas with a homemade shank that he acknowledged was a dangerous weapon. The shank was 10.5 inches long and 1.5 inches wide. Its blade was extremely rough and caused jagged edges around Thomas's laceration and incised wounds. Expert testimony indicated that because the blade was blunt, more force was required to push it through one's skin than that required for a standard knife. Finally, Franklin testified that he wrapped rope around the shank's handle so it would not fall off his wrist, presumably when using it in combat.

Next, the defense presented direct evidence that Thomas conducted three unnecessary "shakedowns" or searches of Franklin's cell, spoke with Franklin aggressively, and at one point ensured that Franklin was either the last inmate to eat or did not eat at all at dining time. Franklin testified that several days before the murder, a "childish" altercation regarding one of the dorm gates developed between him and Thomas. After he realized that discussing the altercation in private would not resolve the issue, Franklin invited Thomas to "handle [it] head

up" in his cell or at the barber shop. According to Franklin, Thomas responded, "If you want me in there, you know how to get me down there."

Franklin and his roommate, Robert Acree, testified that on the night in question, Franklin removed a piece of cardboard from the cell vent that Acree typically used to control the air circulation. Franklin then used the quad intercom system to summon Thomas to the second-floor cell under the false pretense that water was leaking from the vent. Acree and another inmate testified that Thomas was eating a bag of potato chips and did not appear prepared to fight when he arrived at Franklin's cell. They also testified that once Thomas came into the cell and looked up at the vent, Franklin punched Thomas in his face, causing his nose or mouth to bleed profusely. Acree further explained that Thomas appeared shocked and caught unaware. A tussle ensued, during which time Franklin hit Thomas twice more and knocked his radio out of his hand. The record reflects that Thomas's panic button also fell to the floor.

In light of these incidences, there undoubtedly were previous difficulties between the parties. The evidence nevertheless shows that Franklin unilaterally decided to resolve his and Thomas's dispute in a violent manner. And the fact that Franklin created the opportunity and need to engage in physical combat before sucker punching Thomas militates against the conclusion that the attack was not adequately provoked.

Even based on Franklin's version of the events, we are not convinced that Thomas expected a fight. Franklin testified that once Thomas came to the back of the cell and looked up at the vent, Franklin asked, "[W]hat's up? What's up now?" Thomas simply "laughed . . . and he went to eating his chips." At that point, Franklin struck Thomas. On cross-examination, Franklin explained that he perceived Thomas's laughing as not taking the situation seriously and that Franklin wanted to get the "fun and game[s] over with" because the joke was going to continue.

As to the nature and manner of the homicide and wounds inflicted, Thomas managed to disengage himself from the initial tussle and run out of the cell, down the front staircase, and out of Quad 3 toward the officer's station. State witnesses testified that Franklin chased Thomas in the same direction. As Thomas was pulling closed the outer door to the officer's station, Franklin caught up and wedged his foot in the doorway, preventing the door from shutting and locking. A struggle over the outer door ensued, and each time the door opened and exposed Thomas's body, Franklin stabbed Thomas with the shank in a downward motion. Inmate Samuel Selig specifically recalled Franklin burying the shank into Thomas's neck, causing blood to squirt inside the vestibule to the officer's station. This episode lasted approximately thirty seconds.

Medical expert Valerie Rao testified that Thomas sustained a fatal laceration almost three inches in depth to the left side of his neck. The jugular vein and small blood vessels from the subclavian artery were cut and the left lung punctured, which caused one fifth of Thomas's blood to drain into his left chest cavity and his left lung to collapse. Rao testified that Thomas sustained one-inch incised wounds to his right cheek and just outside his right eye, and eight sharp-force defensive wounds on his arms. Rao also found a four-inch-long, top-to-bottom incised wound on Thomas's left scalp, along with a fracture to his skull underneath the wound. She opined that the bent tip of the shank's blade was consistent with having been caused by a forceful blow to Franklin's scalp. Rao determined that a considerable amount of force was exerted in order to fracture Thomas's skull and cause the blade's tip to bend.

This evidence shows that Franklin stabbed Thomas at least twelve times— with considerable force being used to inflict some, if not all, of the stab wounds. Also, the stabs wounds were inflicted not in a single, continuous manner, but at various points throughout the struggle at the officer's station door. As such, Franklin was afforded multiple intervals to reflect upon the fact that he was injuring Thomas with each overhand strike and inevitably would stab Thomas to death. The evidence further shows that there was a break between Franklin's initial assault upon Thomas in the second-floor cell and the subsequent decision to

fatally stab him outside of the first-floor officer's station. See id. at 228. Given these factors, we conclude that Franklin exhibited a fully formed conscious purpose to kill Thomas. See Bradley, 787 So. 2d at 738.

Based on the evidence presented a trial, a rational trier of fact could find the existence of the elements of first-degree premeditated murder beyond a reasonable doubt. See Johnston, 863 So. 2d at 283. Accordingly, we conclude that the record sufficiently supports Franklin's conviction.

## Ring & Hurst v. Florida Claim

Franklin contends that Florida's capital sentencing scheme is unconstitutional in light of the United States Supreme Court's decisions in Ring v. Arizona, 536 U.S. 584 (2002), and Hurst v. Florida, 136 S. Ct. 616 (2016), because the jury that recommended death did not find the facts necessary to sentence him to death. We agree. See Hurst v. State, 41 Fla. L. Weekly S433, S439 (Fla. Oct. 14, 2016). In light of the non-unanimous jury recommendation to impose a death sentence, we reject the State's contention that any Ring- or Hurst v. Florida-related error is harmless. See id. at S443. We also reject the State's contention that Franklin's prior convictions for other violent felonies insulate Franklin's death sentence from Ring and Hurst v. Florida. See id. at S438.

However, we reject Franklin's argument that section 775.082(2), Florida Statutes (2015), requires that we remand his case to the trial court for imposition of

a life sentence. See id. at S440. Accordingly, we vacate Franklin's death sentence and remand this case for a new penalty phase proceeding.

## CONCLUSION

For the foregoing reasons, we affirm Franklin's conviction of first-degree murder, vacate Franklin's death sentence, and remand for a new penalty phase proceeding.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, and PERRY, JJ., concur. CANADY and POLSTON, JJ., concur in the conviction, but dissent as to the sentence.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Columbia County,
    Paul Spurgin Bryan, Judge - Case No. 122012CF000312CFAXMX

Nancy Ann Daniels, Public Defender, and Nada Margaret Carey, Assistant Public Defender, Second Judicial Circuit, Tallahassee, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, and Robert James Morris, III, Assistant Attorney General, Tallahassee, Florida,

    for Appellee