# Supreme Court of Florida

_____

No. SC10-2363
_____

**RASHEEM DIQUOINE DUBOSE,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[February 9, 2017]

PER CURIAM.

On January 3, 2007, Rasheem Dubose was charged by indictment in Duval County with first-degree murder for the killing of Drewshawna Washington-Davis and with shooting into a building. The charge of one count of possession of a firearm by a convicted felon was later added. The State sought the death penalty. The State originally tried Dubose along with his two brothers, who were charged with the same crimes stemming from the same incident. Though the three brothers were tried together, Dubose had a separate jury. Dubose's first trial resulted in a hung jury and a mistrial was declared. His brothers were convicted on all counts and sentenced to life in prison.

Dubose's second trial began in February 2010. The jury found Dubose guilty of both first-degree premeditated murder and felony murder, with burglary as the underlying felony. He was also found guilty of shooting into a building. The jury voted for imposition of the death penalty by a vote of eight to four. On December 9, 2010, the trial court followed the jury's recommendation and sentenced Dubose to death.

Dubose now appeals his convictions and sentences. We have jurisdiction. See art. V § 3(b)(1), Fla. Const. For the reasons set forth in this opinion, we affirm Dubose's convictions and vacate his sentence of death.

## I. STATEMENT OF THE CASE & FACTS

On July 26, 2006, at approximately 4:00 p.m., Willie Davis, Jr., drove his girlfriend, Cinee Tinsley, to the home where she lived with her mother and siblings. As Davis turned onto Tinsley's street, he noticed Dubose's younger brother walking in the street. Davis swerved in an attempt to hit Dubose's younger brother with the car, but was unsuccessful. Dubose's younger brother continued down the street, away from Tinsley's home. Dubose had been on Tinsley's porch with Tinsley's brother and had witnessed the incident. When Davis pulled into Tinsley's yard, Dubose walked toward the car, speaking to Davis through the car window. Davis got out of the car and argued with Dubose for approximately one minute and then returned to the car. Davis quickly drove away from Tinsley's

- 2 -

home with Tinsley still inside the car. Davis drove to his father's house, retrieved a gun, and drove back toward Tinsley's home. On the way back to Tinsley's home, Davis told Tinsley "I'm going to make him get naked in the street."

Davis returned to Tinsley's home and saw Dubose still in the front yard with Tinsley's older brother. Davis got out of the car, grabbed Dubose by his shirt, pushed him against a wall, put the gun to the back of his head, and screamed at him to empty his pockets. Dubose complied and emptied his pockets as commanded, after which Davis ridiculed him for not having any money in his pockets. Davis then ordered Dubose to pull his pants down; again, Dubose complied. Tinsley's mother came out of the house and asked Davis to stop what he was doing. He stopped, but Dubose said something that caused Davis to re-engage with him. Tinsley's mother grabbed Dubose and pulled him into her home. Davis and Tinsley left the scene in Davis's car. Dubose left the Tinsley home a short time later on foot.

Dubose went home and told his two younger brothers that Davis had attempted to rob him. After Dubose made a phone call, he threw and shattered his brother's phone and said, "I'm going to kill this nigger." Dubose left his home shortly thereafter. Dubose's younger brother continuously made phone calls to Maxie Wilson, the brothers' cousin, who is a known drug dealer. That day, Maxie Wilson was driving a white Impala rental car, with his friend Sherman Eley in the

passenger seat. After finally answering the phone and speaking with Dubose's younger brother, Maxie Wilson drove to the home of the Dubose brothers. Upon arrival, Dubose's brothers got into the back seat of Wilson's car. One of them was armed with a nine-millimeter firearm. Maxie Wilson drove around the corner where Dubose was standing in front of a house. Dubose got into the back seat of the car.

Then, Dubose instructed Maxie Wilson to drive around the corner to where Davis's mother lived. Once they arrived at the house, they saw Davis's car parked in the front yard. One of the brothers initially prepared to shoot at Davis's car, but was instructed not to by Sherman Eley. The brothers circled the house again and pulled onto a dirt road behind the house. Maxie Wilson parked the car near the backyard fence line of the victim's house and provided the brothers with two more guns, a .45 caliber pistol and a Glock-nine with an extended magazine, which were both in the car with him prior to the incident. Dubose's brothers armed themselves with the nine-millimeter gun and the .45 caliber gun. Dubose armed himself with the Glock-nine. The Dubose brothers exited the vehicle then jumped a fence to enter Davis's mother's backyard.

Davis and Tinsley had gone to his mother's house after the incident. When they arrived, Davis's mother and stepfather were in the dining area of the residence. Davis was seated on a couch by the window on the side of the house.

Three children, including Davis's eight-year-old niece, Drewshawna, were in the bedroom. When the gunfire began, the initial shots were sporadic and then became more continuous. Immediately after the shooting stopped, Tinsley ran to the bedroom to check on the welfare of the children. Drewshawna, who had been shot in the back, lay on top of her younger cousins in a protective position.

After the shooting, the Dubose brothers returned to Maxie Wilson's white Impala. During the car ride, one of the brothers received a phone call that a child had been killed in the shooting. With Sherman Eley still in the passenger seat, Maxie Wilson drove the brothers to a house owned by David Craighton in a secluded, wooded area. Maxie Wilson had previously requested permission to reside at Craighton's home, under the auspices that he needed a place to live with his girlfriend and young child. While at the house, the brothers gave their clothing and weapons to Maxie Williams. Maxie Williams left the brothers at the house, drove Sherman Eley back to his car, which had been parked at an apartment complex in a different neighborhood, and disposed of the clothes and weapons in a dumpster at that apartment complex. The firearms were never recovered. On the evening of July 30, 2006, Craighton came to his house to find the Dubose brothers occupying it. Craighton used a large stick to hold the brothers in the house until the police arrived and arrested them.

Reconstruction of the bullet trajectories revealed that twenty-nine bullets struck the residence, some from the side and some from the rear. Twenty-three of these shots were fired from Dubose's Glock-nine, including the gunshot that killed Drewshawna. The fatal bullet entered the residence through the window on the side of the house, traveled through at least two walls, and entered the bedroom. Someone looking through this window would not have seen the victim in the bedroom, but possibly would have seen someone sitting on the couch near the dining area.

## Penalty Phase: State's Witnesses

The penalty phase began on March 9, 2010. The State offered victim impact statements from the victim's grandmothers, the victim's aunt, and the victim's third-grade teacher. The State also offered testimony from Officer Scott Medlock, the officer involved in Dubose's conviction for resisting arrest with violence. Officer Medlock explained his pursuit and subsequent physical altercation with Dubose after he fled following a suspicious person stop. The officer also explained that Dubose apologized and stated that he was not attempting to harm the officer, he just wanted to be free. The officer testified that in hindsight he believed that the defendant was not attempting to harm him, but that belief does not, however, lessen the seriousness of Dubose's actions.

## Penalty Phase: Defense Witnesses

In addition to Dubose's family members, who testified on his behalf, Clinical Psychologist and Neurologist, Dr. Hyman Eisenstein, testified as an expert. Dr. Eisenstein testified that Dubose's results on the Comprehensive Test of Basic Skills (CTBS) from first through eighth grade indicate that he scored between the 2nd and 18th percentile (on the low end, 98 percent of the population scored better than him, and on the high end, 82 percent of the population scored better than him). He testified Dubose had academic impairment disability from the first grade through the ninth grade. The doctor also testified that Dubose quit school in the ninth grade but prior to that may have been promoted through special programs or simply promoted despite the fact that he had been failing. Dr. Eisenstein stated there was no indication at all that Dubose was malingering.

Dr. Eisenstein indicated that at the age of 25 years and 11 months, Dubose received an IQ Score of 73 on the Peabody Picture Vocabulary, which is equivalent to a ten year old child. He also testified that Dubose received a grade equivalent to a four year old on the WRAT4 (Wide Range Achievement Test, Fourth Edition); he scored in the sixty-ninth percentile on the reading comprehension portion, with anything below the seventieth percentile being considered mild mental retardation. Dubose's verbal comprehension scores on the WAIS-IV (Wechsler Adult Intelligence Scale, Fourth Edition) equaled 70. A new feature of the WAIS-IV is the GAI (general ability index), upon which the

defendant scored a 75, in the borderline range.  Dr. Eisenstein concluded that Dubose's full scale IQ score was 82, which placed him in the low average range. A PET scan was not conducted, but Dr. Eisenstein stated that other factors present in Dubose's life indicated the possibility that he has sustained some brain damage. Dr. Eisenstein assumed that Dubose has frontal lobe damage, which may have made it difficult for him to get over being humiliated by Davis.  On cross-examination, Dr. Eisenstein acknowledged that Dubose actually began the tenth grade before he dropped out, and that there were various behavior problem reports in elementary school.  On redirect, Dr. Eisenstein opined that Dubose's three-year participation in football and his participation in boxing could have caused brain impairment.

Dr. Alan Fox, professor at Northeastern University, also testified as an expert for the defense.  Dr. Fox explained that poor neighborhoods such as the one where Dubose was raised sometimes have a "code," which is the idea of being respected and important, despite the lack of education or employment.  He further explained that in this type of environment, "violence is seen as an appropriate, virtually a required response to being disrespected, being humiliated."  Dr. Fox reviewed the thirteen DCF reports which contained information that Dubose's father was arrested for abuse; he determined that Dubose always tried to protect the rest of the family from their father.  Dr. Fox testified that because Dubose had no

positive role models in his life and because his grandmother worked so much, he modeled himself after other young men in the neighborhood. Associating himself with the people in his neighborhood, opined Dr. Fox, is what taught Dubose the necessity of fighting.

On cross-examination, Dr. Fox acknowledged that on the date of the shooting, Dubose knew right from wrong, he knew that killing was wrong, and that at every step in the events of the day, he could have made different decisions. He also explained that the code of the street may have a different definition of right from wrong than the conventional meaning. Dr. Fox further acknowledged that persons who grow up in rough neighborhoods, may have a better appreciation for the consequences of violence. Dr. Fox stated that the combination of the risk factors in Dubose's life were "tremendous." Dr. Fox opined that the message Dubose may have intended to send was one of deterrence, "Don't mess with us. We're not weak. We won't take it lying down[,]" as opposed to retribution which could have been accomplished by finding Davis and doing something to him personally, one-on-one. Dr. Fox acknowledged that he met with Dubose for a total of forty-five minutes to an hour.

**Spencer Hearing**

At the conclusion of the penalty phase, the jury recommended by a vote of eight to four that Dubose be sentenced to death for the murder of Drewshawna.

Prior to sentencing, the court held a <u>Spencer</u> hearing on November 10, 2010. In consideration of the time between the penalty phase and the <u>Spencer</u> hearing, some of the witnesses repeated their testimony from the penalty phase. Multiple family members and mental health experts testified at the <u>Spencer</u> hearing, including Dr. Eisenstein and Dr. Waldman.

Dr. Eisenstein and Dr. Waldman restated their conclusions that Dubose suffered from frontal lobe damage that significantly impaired his ability to control his impulses. As further mitigation, the defense offered a report that evaluated the results of Dubose's PET scan. Dubose was administered the PET scan in anticipation of the <u>Spencer</u> hearing. Dr. Ruben C. Gur, who evaluated the results and wrote the report that was admitted into evidence, concluded that Dubose suffered abnormalities in regions of the brain that play a significant role in regulating behavior.

## II. ANALYSIS

### Juror Misconduct

Dubose argues that the trial court erred in denying his motion for a mistrial based on juror misconduct. On April 23, 2010, Dubose filed a motion for a mistrial based on alleged juror misconduct. Attached to the motion was an affidavit from a juror. The motion alleged that the jurors had conducted internet research regarding the meaning of the defendant's facial tattoo during the penalty

phase deliberations. Also attached were numerous articles regarding the meaning and definition of a teardrop tattoo.[1] The juror's affidavit also stated that the jurors used their cell phones to Google "tear drop tattoos on gang members" to find out what that tattoo meant. Allegedly, they learned that the tattoo is what gang members receive after they kill someone. In addition, the juror alleged that racial references were also made during the deliberations.

The trial judge held a hearing during which he questioned the juror about some of the allegations made in her affidavit. Much of the testimony that the affiant juror provided was related to unauthorized cell phone usage during the trial. She stated that she did not observe anyone using a cell phone during the guilt phase deliberations, but recalled the jury foreperson using his cell phone on breaks and during sidebars, although she could not see what he was doing on his cell phone. The affiant juror also observed the foreperson on the phone during the penalty phase, but she could not hear his conversation. She also admitted that she used her iPod touch device during the breaks, but she stated that she only played games on it because she could not access the internet in the courthouse.

The affiant juror told the judge that no one appeared to be conducting internet research during deliberations. She also testified that another juror, whom

_____

1. Dubose's motion informed the trial court that Dubose's facial tattoo was actually a dollar sign, not a tear drop.

- 11 -

she identified by seat and physical description, used his phone during penalty phase deliberations, but was not observed making a phone call. She further alleged that the jury was not reminded that they were not allowed to have their cell phones during the penalty phase deliberations, and that the phones were not confiscated prior to deliberations.

When questioned regarding her statement that other jurors conducted internet research regarding the meaning of Dubose's facial tattoo, the affiant juror explained that the discussion of Dubose's tattoo occurred during a break and resulted from the defendant cutting his dreadlocks after the guilt phase, thereby making his facial tattoo more visible in the penalty phase. Further, in consideration of the juror's testimony that she could not see what the two jurors who had used their phones were actually doing, the court found her not to be credible on this issue.

When questioned regarding her responses during the polling of the jury in the guilt and penalty phases, the affiant juror inquired as to whether she could be subjected to perjury charges, and ultimately refused to state whether she agreed that the announced verdict reflected her vote. She stated that she did not have a problem with the answer that she gave to the polling question during the guilt phase, but that her answer during the penalty phase bothered her. She explained that she went along with the verdict because she has three children and she did not

want to be singled out in a courtroom filled with spectators and media. She further expressed some concern for her children because gang members were involved.

She stated that after the guilt phase, but before the penalty phase, she attempted to contact the trial judge by email, because she did not want to address her concerns in front of the other jury members. She admitted that her emails did not mention that she was a juror in the case and did not state her name or the purpose of her request for an appointment with the judge. She admitted to contacting the Public Defender's Office, a private attorney, and Dubose's defense counsel, claiming to be a friend of a juror in the Dubose case. She was unclear as to who drafted the finalized affidavit that was presented to the trial court. She explained that a private attorney helped her draft her affidavit, typed it, and emailed it to her. She then explained that she spoke on the phone with Dubose's counsel and ultimately met him for lunch to discuss what she perceived to be juror misconduct. Following this initial meeting, she briefly met Dubose's counsel in a parking lot to sign the affidavit that had already been printed and notarized. When the trial judge attempted to gain some clarity on the drafting of the affidavit, the juror refused to answer any more questions.

After the juror interview, the defense made additional arguments in support of a new trial. The trial court entered a written order denying a mistrial and a request for a new trial. The trial court determined that allegations in the juror's

affidavit and the defense counsel's motions were contradicted by the information that the juror provided at the hearing. The trial court compared the allegations set forth in the juror's affidavit, those raised in the defendant's motions, and the testimony provided by the juror at the hearing, and ultimately found, based in part on the juror's demeanor, that the juror was biased in favor of the defendant and unreliable.[2]

This Court heard oral argument in this case on October 8, 2013. Thereafter, we remanded the case to the trial court for further inquiry of the remaining jurors on the juror misconduct issue, specifically regarding allegations of racial remarks made by jurors; jurors' knowledge of the victim's great-grandmother's burned down house; and cell phone/internet research conducted by the jurors. The trial court subpoenaed the twelve jurors and two alternates. Twelve of the fourteen jurors responded by appearing and giving testimony. One juror had relocated to Georgia and was unable to be served. The affiant juror is the only juror who was served and refused to appear. A significant portion of the proceedings on remand was used to coordinate a date, time and method to interview the affiant juror. The

---

2. At the hearing, the juror was not questioned concerning her allegations of racial references and that the video of the defendant's police interview needed subtitles in order for the jury to understand Dubose's English.

trial court offered to interview her in person, by telephone, and by video; she refused all methods.

Consistent with its initial denial of a mistrial and the request for a new trial, the trial court ultimately found that the affiant juror was not credible and that the examination of the other jurors did not support the allegations made in the motions and the affidavit. Additionally, the trial judge found that the affidavit submitted to the court alleging juror misconduct was not drafted by the juror, but was drafted by Dubose's counsel and that following Dubose's second trial, which is the subject of this appeal, Dubose's attorney formed an attorney-client relationship with the affiant juror. There is competent, substantial evidence in the record to support the trial court's finding, and we, therefore, deny relief on this issue.

The evidence from the jurors interviewed supports the conclusion that some of the jurors had cell phones and tablet devices during the guilt and penalty phases and during breaks, but not during deliberations. None of the interviewed jurors testified that any of the jurors actually used their electronic devices to conduct research related to the case or made disparaging racial remarks about the defendant. There is evidence that the complaining juror improperly used her electronic device to contact Assistant Public Defender Fred Gazaleh, apparently while court was in session. Gazaleh testified that he assumed that court was in session, based on the time of day that he received the messages, and therefore did

not feel comfortable responding to the messages. Despite the misconduct on the part of the complaining juror, there is no evidence that the use of the electronic devices contributed to the jury verdict.

At the hearing on remand from this Court, none of the jurors recalled any racial remarks or any remarks about the defendant's hair. Some of the jurors had some knowledge of someone involved in the case or the victim's great-grandmother's housing burning down. Others said they had no knowledge of this event or anyone involved in the case. None of the jurors saw any other juror conducting internet research, although several of the jurors had cell phones and other electronic devices. Several of the jurors indicated that remarks were made about the quality of the video and that the defendant's voice was mumbled as he did not speak clearly into the microphone. The testimony on remand did produce evidence that during the penalty phase, one member of the jury stated that a teardrop tattoo indicated that someone had been to jail or was remembering somebody who died. This was not evidence adduced at trial. Furthermore, the evidence indicates that this remark was not made during the course of deliberations nor to the entire jury panel.

Following the trial court's decision on remand, Dubose filed a motion in this Court for additional briefing, alleging that the trial judge had asked the jurors improper questions regarding how the juror misconduct allegations affected their

individual verdicts.  Although the trial court indeed conducted an improper inquiry as to matters that inhere to the jury verdict, we find that this error was harmless.

In State v. Hamilton, 574 So. 2d 124 (Fla. 1991), this Court agreed with the test formulated by the Fifth Circuit Court of Appeals[3] and adopted by the Eleventh Circuit Court of Appeals [4] that when questioning jurors regarding allegations of juror misconduct, a judge or counsel is to limit the inquiry to an "objective demonstration of extrinsic factual matter disclosed in the jury room," and "must not inquire into matters relating to the jurors' thought processes."  Id. at 129.  "Having determined the precise quality of the jury breach, if any, the [trial] court must then determine whether there was a reasonable possibility that the breach was prejudicial to the defendant."  Id. (quoting United States v. Howard, 506 F.2d 865, 869 (5th Cir. 1975) (emphasis added)).  This test was reiterated by this Court in Keen v. State, 639 So. 2d 597 (Fla. 1994).

During the inquiry of the jurors in Keen, the trial judge asked them whether an article concerning the tactics of defense attorneys in criminal cases found in the jury room influenced their decisions; the jurors stated that it did not.  Id. at 599.  The trial judge denied the defendant's motion for a new trial, but this Court reversed.  Id. at 599-600.  We found that the trial judge erred in questioning jurors

---

3.  See United States v. Howard, 506 F.2d 865 (5th Cir. 1975).

4 . See United States v. Perkins, 748 F.2d 1519 (11th Cir. 1984).

about the items which factored into their decision-making process. Id. at 599. We also found that we could not say beyond a reasonable doubt that the trial court error was harmless, and we concluded that the defendant was entitled to a new trial. Id. at 600 (citing State v. DiGuilio, 491 So. 2d 1129, 1139 (Fla. 1986)); see also Devoney v. State, 717 So. 2d 501 (Fla. 1998).

The trial judge in this case also made an inquiry into matters that factored into the jury's decision-making process; such an inquiry was error. Nonetheless, it does not appear that the trial court relied on the improper inquiry to deny the motions for mistrial and for a new trial on remand. The trial judge instead found that none of the other jurors committed juror misconduct, and he denied the motions on this basis. Therefore, the asking of the improper question was not the basis of the denial of the motions. Under the circumstances of this case, the trial court's error was harmless beyond a reasonable doubt. See DiGuilio, 491 So. 2d at 1139.

Additionally, regarding any allegation that racial remarks, unauthorized materials, or outside research affected the verdict, relief is not warranted. No juror testified that any racial remarks were made. While the evidence from the jurors interviewed supports the conclusion that some of the jurors had cell phones and tablet devices during breaks and lunch in the guilt and penalty phases, no juror recalled anyone's use of electronic devices during deliberations. Further, each of

- 18 -

the jurors denied using his or her cell phone to access the internet or to conduct outside research. To the extent that cell phones were inside the jury room and could be considered unauthorized materials in the jury room, based on the evidence in this case, "it is not reasonable to assume that jurors derived any prejudicial legal or factual conclusions" from these devices. Hamilton, 574 So. 2d at 130-31.

Assuming that one juror educated the other jurors on the meaning of a teardrop tattoo during the penalty phase after observing a tattoo on the defendant's face—which apparently was not a teardrop—there was conflicting testimony as to the brevity of the discussion and the source of the juror's knowledge is unclear. Whether or not it could be considered to be improper discussion and not a matter inhering in the verdict, there is no reasonable probability that this breach was prejudicial during the penalty phase of his trial. See id. Dubose had already been convicted of murder and during the penalty phase, the jury was informed that Dubose had a prior violent felony. In addition, through the testimony of Dubose's own witness, the jury learned that Dubose had been incarcerated awaiting the trial of this case.

## Sufficiency of the Evidence

The evidence in a capital case is judged to be sufficient when it is both competent and substantial. See Phillips v. State, 39 So. 3d 296, 308 (Fla. 2010). In conducting its review, this Court looks at the evidence in the light most

favorable to the State to determine if a rational trier of fact could find the elements of the crime were proven beyond a reasonable doubt. See Rodgers v. State, 948 So. 2d 655, 674 (Fla. 2006) (quoting Bradley v. State, 787 So. 2d 732, 738 (Fla. 2001)). Furthermore, when a general verdict is rendered by the jury after the jury was instructed on both premeditated first-degree murder and first-degree felony murder, this Court will affirm the conviction if either form of first-degree murder is supported by competent, substantial evidence. See Crain v. State, 894 So. 2d 59, 73 (Fla. 2004). Here, the jury was instructed on both first-degree premeditated murder and first-degree felony murder, with burglary being the underlying felony. The defendant was convicted of first-degree murder under either theory.[5]

First, there is sufficient evidence in this case to support a conviction for first-degree premeditated murder. This Court has stated that

> Premeditation is defined as more than a mere intent to kill; it is a fully formed conscious purpose to kill. This purpose may be formed a moment before the act but must exist for a sufficient length of time to permit reflection as to the nature of the act to be committed and the probable result of that act.

Bradley, 787 So. 2d at 738 (quoting Woods v. State, 733 So. 2d 980, 985 (Fla. 1999)). Premeditation may be inferred from such facts as "the nature of the weapon used, the presence or absence of adequate provocation, previous

---

5. The jury additionally found that the defendant discharged a firearm causing death or great bodily harm during the commission of the offense.

- 20 -

difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted." Id. (quoting Norton v. State, 709 So. 2d 87, 92 (Fla. 1997)).

The State introduced competent, substantial evidence of Dubose's guilt. The State proved that the Dubose brothers stealthily drove around the back of Vonnie Frazier's home, jumped a fence to get closer to the house and stood in the yard while relentlessly spraying the house with bullets. Dubose's premeditated design to kill is evidenced by the fact that he armed himself with a weapon, went to the victim's home with the weapon displayed, and shot that weapon, a Glock-nine with the capability to travel through at least two walls, into an open window of an occupied home. One of these bullets ultimately killed Drewshawna. Therefore, we find that the facts of this case provide competent, substantial evidence to support Dubose's first-degree premeditated murder conviction.

Additionally, the State presented sufficient evidence to support the first-degree felony murder conviction. The jury found Dubose guilty of first-degree felony murder, with burglary as the underlying felony. Burglary is a qualifying felony that supports a conviction for first-degree felony murder. See § 782.04(1)(a)2.e., Fla. Stat. (2006). As discussed below, the State's evidence demonstrated that the Dubose brothers unlawfully entered the curtilage of Vonnie Frazier's home, committing burglary, when they shot Drewshawna. Therefore,

because we find that Dubose had premeditated intent to kill, and that he committed a burglary during the shooting, we affirm his conviction for first-degree murder.

**Burglary**

Dubose argues that the underlying felony, burglary, was not proven at trial, and he therefore cannot be convicted of felony murder. In Dubose's first trial, defense counsel filed a motion in limine with a memorandum of law to prohibit the State from arguing felony murder on the theory of burglary, arguing that the gap in the fence allowing for the driveway prevents the yard from being considered curtilage under this Court's decision in State v. Hamilton, 660 So. 2d 1038 (Fla. 1995). This motion was denied. The defense renewed this motion at the beginning of the second trial. The trial court once again denied this motion. Therefore, this claim was preserved. See Steinhorst v. State, 412 So. 2d 332, 338 (Fla.1982) ("in order for an argument to be cognizable on appeal, it must be the specific contention asserted as legal ground for the objection, exception, or motion below.") (emphasis added).

During the jury charge conference, the State moved the trial court to add a sentence to the verdict form at the end of the definition of a structure, to read: "The space of ground immediately surrounding the structure does not have to be totally

enclosed."[6]  In objecting to the State's motion, defense counsel argued the standard

jury instruction is sufficient.  Defense counsel then generally argued that the

victim's home did not have a gate and was not capable of being totally enclosed.

Relying on this Court's decision in Hamilton, the trial court denied the State's

motion.

Dubose's brother raised this same argument in his appeal to the First District

Court of Appeal.  Dubose v. State, 75 So. 3d 383, 384-85 (Fla. 1st DCA 2011).  In

finding that "the fencing around the residential yard in the instant case . . . satisfies

the enclosure requirement in Hamilton[,]" the First District stated:

> The area surrounding a dwelling or structure must lie within "some
> form of an enclosure" to be considered part of the curtilage.  State v.
> Hamilton, 660 So. 2d 1038, 1044-45 (Fla. 1995).  In this case, the
> yard of the home Appellant and his brothers fired upon had a chain
> link fence around it, with an opening in front for the driveway.  This
> court recently held that the enclosure "need not be continuous[,] and
> an ungated opening for ingress and egress does not preclude a
> determination that the yard is included in the curtilage of the house."

Id. at 385.  We approve the reasoning and decision of the First District in Dubose,

and find that the trial court did not commit reversible error by allowing the

instruction on felony murder based on burglary to go to the jury.

---

6. Based on the statements of the prosecutors, two previous juries had asked
this same question.  It is not clear from the record whether the prosecutors are
referring to the juries that found the other Dubose brothers guilty, or if one of the
referenced juries includes the jury in Dubose's first trial, where a mistrial was
declared.

**Motion for Change of Venue**

Dubose argues that the trial court should have granted his motion for change of venue. We find that the trial judge did not err in denying Dubose's motion. Section 47.121, Florida Statutes (2010), states that "[a] change of venue shall be granted when it appears impracticable to obtain a qualified jury in the county where the action is pending." This Court has determined that some knowledge of the case by potential jurors is not sufficient reason standing alone to require a change of venue. In McCaskill v. State, 344 So. 2d 1276 (Fla. 1977), we articulated the test as follows:

> Knowledge of the incident because of its notoriety is not, in and of itself, grounds for a change of venue. The test for determining a change of venue is whether the general state of mind of the inhabitants of a community is so infected by knowledge of the incident and accompanying prejudice, bias, and preconceived opinions that jurors could not possibly put these matters out of their minds and try the case solely upon the evidence presented in the courtroom.

Id. at 1278 (quoting Kelley v. State, 212 So. 2d 27, 28 (Fla. 2d DCA 1968)); accord Manning v. State, 378 So. 2d 274, 276 (Fla. 1979).

As this Court made clear in Rolling v. State, 695 So. 2d 278, 285 (Fla. 1997), in ruling on a motion for a change of venue, the trial court should consider: "(1) the extent and nature of any pretrial publicity; and (2) the difficulty encountered in actually selecting a jury." In evaluating the first prong,

> the trial court must consider numerous factors, such as: (1) the length of time that has passed from the crime to the trial and when, within

this time, the publicity occurred; (2) whether the publicity consisted of straight, factual news stories or inflammatory stories; (3) whether the news stories consisted of the police or prosecutor's version of the offense to the exclusion of the defendant's version; (4) the size of the community in question; and (5) whether the defendant exhausted all of his peremptory challenges.

Id. at 285 (citations omitted).

The first three factors of the first prong can best be addressed collectively. The shooting in this case occurred on July 26, 2006. The first trial, involving all three defendants, occurred in January 2010. Jury selection in the second trial began on February 8, 2010. Prior to the first trial, the defense filed a pretrial motion to change venue, citing extensive pretrial publicity. The defense attached a study regarding the effects of pretrial publicity on juror verdicts, along with numerous news articles addressing the story. Most of the news articles attached to the defendant's motion are dated the same week that the crime occurred and contained basic facts obtained as the story developed. The major basis for many of the news articles was the fact that the Mayor of Jacksonville funded a task force to allow the Sheriff to pay police officers more overtime, in order to patrol "high risk" areas in Jacksonville, to deal with the widespread murders in the areas. In these articles, the mayor and the sheriff urged the community to assist in decreasing the crime rate and generally warned all of the criminals that they would be caught.

The news articles published close in time to the crimes also provided information such as who the persons of interest were and the reason for the shooting, as alleged by neighbors. Many of the news reports cited the basis for the shooting as a retaliatory or "respect shooting," indicating that the suspects at that time shot into the house in retaliation for a robbery that occurred earlier that day. The news reports attached to the motion detail the court appearances of the brothers, as well as the person that the brothers were allegedly aiming for, Willie Davis, Jr. On the one-year anniversary of the victim's death, there was an article advertising a memorial service, which a few of the jurors remembered seeing. There were two articles attached, dated early February 2008, which detailed the disciplinary files of all three brothers since they were arrested for the crimes.

In one of these articles, a representative of the Jacksonville Sheriff's Department made multiple disparaging remarks about all three defendants, referring to them as "miscreants," "a menace to society," calling their behavior "despicable," and stating that "they are in the right place." The articles attached that were written in 2009 (the latest dated May 2009) provided information about court hearings and indicated that the state sought to have separate trials, and seek the death penalty for Dubose and life sentences for the other two defendants. The latest dated article attached to the motion was dated the same week as the trial, and

included a detailed timeline of events since the incident and a diagram of the home where the victim was shot.

The attached articles do not indicate that the entire community was biased against Dubose in a manner that would make it impossible to choose an impartial jury. Additionally, the attached articles do not exclude the defendants' version of events; some of the articles even include excerpts from the police interrogation where the defendant denies any involvement in the crime. Further, even considering the disparaging remarks made by the representative of the Sheriff's Department, there was no indication that any of the jurors read that article, or adopted those views to the point that the jurors' ability to be impartial was jeopardized. Although the defense renewed its motion for a change of venue at the beginning of the second trial, there is no evidence that the defense supplemented the record with news reports that occurred after the first trial, but before the second trial.

As to the fourth factor of the first prong, there were no arguments made that the defendants could not receive a fair trial in Duval County, based on the size of the county. During the individual voir dire process, each juror indicated that, if chosen for the jury, he or she could be fair and impartial and only decide the case based on the evidence presented in the trial. Finally, the defense used all ten of its

peremptory challenges, along with three additional challenges that were requested and granted.[7] A fourth additional peremptory challenge was requested, but denied.

As to the second prong, the defense and the State were able to agree on a jury panel and two alternates with approximately five jurors remaining who had not been stricken. The defense counsel did not appear to have any difficulty in selecting jurors who indicated that they could be fair and impartial in this case. In fact, even the potential jurors who had extensive prior knowledge of the case indicated that their knowledge did not result in any bias toward the defendant.

This case is distinguishable from Manning v. State, 378 So. 2d 274 (Fla. 1979), where this Court determined that the trial court abused its discretion in denying the defendant's motion to change the venue of the trial. Manning was a young, Black male from a different county who was arrested in a rural county and charged with murdering two Caucasian sheriff's deputies. Id. at 276. The pretrial

---

7. The defense raised a standing objection to any juror that had knowledge that there was a mistrial in Dubose's previous trial. The court consistently denied this motion, reasoning that the jurors are qualified as long as they do not share the information with another juror and as long as the juror states that the knowledge of the previous mistrial will not affect his or her impartiality. The defense sought additional peremptory challenges, reasoning that it used at least three of its peremptory challenges on potential jurors that the defense argues should have been stricken for cause. In recognizing that the trial court had the authority to grant the peremptory challenges "free and liberally," the court granted both sides three additional peremptory challenges, following individual requests by the defense. The court denied the defense's request for a fourth additional peremptory challenge.

publicity included information provided to the media regarding the version of events represented by the state attorney's office and the local sheriff's department, which contradicted the version of events given by the appellant shortly after his arrest. Id. at 275. Every person on Manning's perspective jury "had prior knowledge of the alleged crimes through news media accounts and community discussion." Id.

> The defense attached various newspaper articles to the motion, as well as affidavits of fifteen persons, including the defendant, stating that because of bad feelings and prejudice against the defendant and because of the adverse publicity concerning the case, the affiants were convinced by reason of personal observations and knowledge of the conduct and statements by various persons in Columbia County that the defendant could not receive a fair and impartial trial in that county. In addition, the defendant alleged that local police officers made various threats against his life, physically and verbally abused him, and harassed his mother when she came to visit him in jail.

Id. The jury found the appellant guilty and recommended imposition of the death penalty.

In this case, the defendant lived in the same county where the crime occurred. As expected, the death of an innocent child may draw just as much emotion and media attention as the killing of two police officers. Here, fifty-three of the sixty-nine potential jurors admitted to seeing or hearing media coverage of the case. The individual voir dire sessions revealed that while few potential jurors knew intricate details of the case or had followed the first trial, many of the potential jurors only read or heard from the media reports that a child was killed in

a "drive by" shooting, where she was not the target, which is essentially the same information that was provided to the potential jurors during the court's summary at the beginning of jury selection. One of the alternate jurors had the most information about the case, and was able to recite the basic facts and procedural posture of the case.

Of the 53 jurors who admitted to previously hearing some information about the case, six were chosen to serve on the jury and two were chosen as alternates. The other six jurors indicated that they had not previously heard about the case before reporting for jury duty. Although Dubose claims that the media attention surrounding the incident portrayed Dubose and his brothers in a very negative light, none of the potential or actual jurors indicated that the media attention caused them to view Dubose or his brothers with any preconceived bias or hostile feelings. Therefore, the trial court properly denied Dubose's motion for change of venue.

### Cumulative Error

The defense argues that it was denied a fair trial based upon the trial court's failure to grant its motion for change of venue and its motion for mistrial based on juror misconduct. However, where the individual claims of error are without merit, the claim of cumulative error must fail. Griffin v. State, 866 So. 2d 1, 22 (Fla. 2003). It does not appear that the trial court committed error in denying the

defendant's motions for change of venue and for mistrial.  Therefore, the defense is not entitled to relief on this claim.

## Constitutionality of the Sentencing Statute

Dubose contends that his death sentence is unconstitutional under Ring v. Arizona, 536 U.S. 584 (2002).  During the pendency of Dubose's direct appeal, the United States Supreme Court found Florida's capital sentencing scheme unconstitutional in violation of the Sixth Amendment right to a jury trial.  Hurst v. Florida, 136 S. Ct. 616, 619 (2016).  In Hurst v. State, we explained that the jury in a capital case must find the following facts unanimously: "the existence of the aggravating factors proven beyond a reasonable doubt, that the aggravating factors are sufficient to impose death, and that the aggravating factors outweigh the mitigating circumstances."  202 So. 3d 40, 53 (Fla. 2016).  We have determined that section 775.082(2), Florida Statutes, does not require us to remand all death penalty cases for the imposition of a life sentence.  See id. at 63-66.  See also Franklin v. State, 41 Fla. L. Weekly S573 (Fla. Nov. 23, 2016).  We have also determined that in cases where the jury makes a non-unanimous recommendation of death, the Hurst error is not harmless.  See Id. at S575.

Because the recommendation of death in this case was not unanimous, we cannot find beyond a reasonable doubt that the error did not contribute to Dubose's

sentence.  Accordingly, Dubose is entitled to relief, and we need not address the proportionality of his sentence or his other claims relating to the penalty phase.[8]

### III.  CONCLUSION

For the above stated reasons, we affirm Dubose's convictions, vacate Dubose's death sentence, and remand for a new penalty phase proceeding.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., concur.
CANADY and POLSTON, JJ., concur as to the conviction but dissent as to the sentence.
LAWSON, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Duval County,
    Lawrence Page Haddock, Jr., Judge - Case No. 162006CF018285AXXXMA

Richard Randall Kuritz, Jacksonville, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Carolyn Marie Snurkowski, Associate Deputy Attorney General, and Berdene Bevione Beckles, Assistant Attorney General, Tallahassee, Florida; and Lisa-Marie Krause Lerner, Assistant Attorney General, West Palm Beach, Florida,

---

8.  Dubose also claimed the following related to his penalty phase: (1) trial court erred in refusing to consider as mitigation Dubose's attempt to enter into a plea agreement; and (2) the trial court erred in denying Dubose's motions for continuance based on the defense's request for a PET scan amid suspicions of brain injuries and in denying a continuance of the Spencer hearing to allow a continuance to have testimony regarding the PET scan that was done between the penalty phase hearing and the Spencer hearing.

for Appellee